In re Jimmy Clark TAYLOR &
Deborah Carter Taylor,
Debtors.

Deborah Carter Taylor, Plaintiff,

v.

United States of America, Department of Education, Defendant.

Bankruptcy No. 96–43284.
Adversary No. 97–40565.

United States Bankruptcy Court,
N.D. Alabama,
Eastern Division.

June 26, 2000.

Harry P. Long, Anniston, AL, for plaintiff-debtor.

Sheryl L. Floyd, Department of Justice, Civil Division, Washington, DC, Richard O'Neal, Assistant United States Attorney, Birmingham, AL, for defendant.

James G. Henderson, Birmingham, AL, Chapter 7 Panel Trustee.

## OPINION

JAMES SCOTT SLEDGE, Bankruptcy Judge.

A Trial was held on May 11, 2000 in the above-captioned matter. The Plaintiff, Counsel for the Plaintiff and Counsel for the Defendant were present. The ultimate issue presented is whether the Department of Education regulations for student loans violate the anti-discrimination provisions of the Bankruptcy Code. The Court hereby declares the following:

*FINDINGS OF FACT*

The following facts were stipulated by both parties:

1. On June 26, 1996, The Chase Manhattan Bank, N.A. approved a PLUS loan with disbursements scheduled for July 1996 and January 1997. The first disbursement was made.

2. On or about November 7, 1996, the Plaintiff, Deborah Carter Taylor, filed the above-styled Chapter 7 case.

3. That as early as November 22, 1996, a determination that the loan was non-dischargeable was made by the Defendant or said decision was made by others pursuant

to the Defendant's instructions or requirements.

4. The Plaintiff, Deborah Carter Taylor, has taken no action as of this date to obtain a determination that her debt to The Chase Manhattan Bank, N.A., was dischargeable under 11 U.S.C. § 523 or otherwise and said debt is excepted from discharge under 11 U.S.C. § 523(a)(8).

5. On January 7, 1997, a decision was made by the Defendant, or by others, pursuant to Defendant's instructions and requirements that the second disbursement approval for the promissory note signed prior to the filing of bankruptcy was removed.

6. On February 27, 1997, a Discharge of the Debtors was entered in the above-styled bankruptcy case.

7. Prior to the Debtors' bankruptcy, the Plaintiff, Deborah Carter Taylor, entered into a promissory note for a loan from the Tennessee Student Assistance Corporation which was funded by The Chase Manhattan Bank, N.A.

8. Said loan was for the purposes of assisting the Plaintiff's son with tuition and other expenses of attending the University of the South in Sewanee, Tennessee.

9. Said loan was approved by the Chase Manhattan Bank, N.A., by letter dated June 20, 1996.

10. On February 28, 1997, the Plaintiff, Deborah Carter Taylor, was advised by the University of the South that the Chase Manhattan Bank, N.A., had canceled the second distribution of this loan because of the Plaintiff, Deborah Carter Taylor, filing a bankruptcy.

11. On or about March 6, 1997, Deborah Carter Taylor reapplied for a PLUS loan in the amount of Five Thousand Dollars ($5,000.00).

12. By letter dated March 17, 1997, the Plaintiff, Deborah Carter Taylor, was requested to commence payments on the initial outstanding funding of the loan with the repayment period beginning on March 5, 1997, and the first payment in the amount of $65.90 due on April 13, 1997.

13. No additional financial information on the Plaintiff other than her bankruptcy was obtained by the Defendant or anyone acting under its instructions or requirements until March 18, 1997.

14. By letter dated March 18, 1997, the Chase Manhattan Bank, N.A., advised the Plaintiff, Deborah Carter Taylor, that the reasons that her application for the balance of her loan was canceled were because of her bankruptcy and default on a loan.

15. Deborah Carter Taylor obtained funding for her son's tuition and expenses from her parents on or about April 8, 1997.

16. In its March 18, 1997 letter, the Chase Manhattan Bank, N.A., advised the Plaintiff, Deborah Carter Taylor, that Ms. Taylor would be eligible to reapply for a PLUS loan if she obtained an endorser with an acceptable credit history or if she provided the servicing company with an updated credit report indicating that all accounts were either current or that the adverse credit condition had been resolved. The letter also stated that Sallie Mae would consider her application if she provided a written statement from her creditor stating that she had made satisfactory arrangements to repay the debt.

17. Ms. Taylor's own records indicate that she obtained an endorser for the second PLUS loan on April 2, 1997. However, Ms. Taylor did not submit the endorsement form to Sallie Mae.

In addition, the Court finds the following:

18. Sallie Mae denied the second disbursement of the Plaintiff's PLUS loan on January 21, 1997 because the Plaintiff had filed bankruptcy.

19. Sallie Mae denied the second loan application on March 18, 1997 because the Trans Union credit report indicated the Plaintiff's debt to the City Bank of Childersburg was delinquent.

20. The Plaintiff's debt to the City Bank of Childersburg was discharged on February 27, 1997.

21. Plaintiff's husband lost his job as president of a local bank. The loss of income jeopardized the ability of the son to remain in college.

22. The University of the South notified Plaintiff and her son that the student loan was canceled. Plaintiff and her son were notified the son would be barred from attending classes.

23. The inability to protect her son from the adverse consequences of the father's loss of job caused Plaintiff great anguish and emotional distress. She suffered headaches, loss of sleep and lack of concentration. Plaintiff withdrew and often cried. Her performance as a high school math teacher suffered. She did not receive any medical treatment for these conditions.

## CONCLUSIONS OF LAW

### 1. Jurisdiction

This Court has jurisdiction according to 28 U.S.C. §§ 157 & 1334. Both parties have admitted the Court has jurisdiction.

### 2. Trial Issues

#### A. *Legal Issues*

##### I. SOVEREIGN IMMUNITY

The Defendant admits the federal government's sovereign immunity is waived under section 106, which states:

Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections ... 525 ...

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such an order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

11 U.S.C. § 106 (1997). Moreover, the 11th Circuit in *Hardy v. United States* stated "the Bankruptcy Reform Act of 1994, which contained amendments to section 106 specifically and unequivocally waives sovereign immunity for governmental units for numerous sections of the bankruptcy code." 97 F.3d 1384, 1387–88 (11th Cir.1996).

##### II. SECTION 525(c)(1)

■ The contentious issue in this case is whether the Department of Education's regulations violate 525(c)(1). Section 525(c)(1) states:

*A governmental unit that operates a student loan grant or loan program* and a person engaged in a business that includes the making of loans guaranteed or insured under a student loan program *may not deny a grant, loan, loan guarantee,* or loan insurance *to a person that is or has been a debtor under this title* or a bankrupt or debtor under the Bankruptcy Act, or another person with whom the debtor or bankrupt has been associated, *because the debtor or bankrupt is or has been a debtor under this title* or a bankrupt or debtor under the Bankruptcy Act, *has been insolvent before the commencement of a case under this title* or during the pendency of the case but before the debtor is granted or denied a discharge, *or has not paid a debt that is dischargeable in the case under this title* or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(c)(1) (1997) (emphasis added). The Defendant first argues that

section 525(c) does not grant the Plaintiff a right of action. In support of its conclusion, the Defendant refers to section 362, which provides a clear right of action, as a stark contrast to section 525. Though the Defendant is correct that there is a difference in the wording of sections 362 and 525(c), the Defendant does not explain how the lack of section 362–type of language in section 524 has affected debtors' suits to enforce the discharge injunction. It is generally accepted that suits under section 524 should be treated similarly to suits under section 362. *See, e.g., In re Hardy*, 97 F.3d 1384, 1389 (11th Cir.1996) (stating that "[w]hile it is true that § 524 does not specifically authorize monetary relief, the modern trend is for courts to award actual damages for violation of § 524 based on the inherent contempt power of the court").

Moreover, courts have consistently used section 105 to enforce other provisions of the Bankruptcy Code. *See, e.g., In re Hopkins*, 66 B.R. 828, 833–34 (Bankr.W.D.Ark. 1986) (discussing several cases that have referred to section 105 as authority for enforcing section 525). Section 105(a) grants bankruptcy courts broad power, stating:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (1997). This grant of power enables the Court to recognize a right of action in anti-discrimination sections such as section 525(c). *See In re Exquisito Services, Inc.*, 823 F.2d 151, 155 (5th Cir.1987) (holding that section 105 grants Bankruptcy Courts the authority to enforce the provisions of section 525(a)).

■ The Defendant also contends its regulations merely discriminate against, but do not mandate denial of, loan approvals for individuals who have filed bankruptcy. In essence, the Defendant argues section 525(a) prohibits discrimination but section 525(c) prohibits denial. Thus, one is permitted to discriminate under section 525(c), according to the Defendant.

To support its argument, the Defendant points to the legislative history of section 525(c), which states:

> This section clarifies the antidiscrimination provisions of the Bankruptcy Code to ensure that applicants for student loans or grants are not denied those benefits due to a prior bankruptcy. The section overrules *In re Goldrich*, 771 F.2d 28 (2nd Cir.1985), which gave an unduly narrow interpretation to Code section 525. Like section 525 itself, this section is not meant to limit in any way other situations in which discrimination should be prohibited. Under this section, as under section 525 generally, a debtor should not be treated differently based solely on the fact that the debtor once owed a student loan which was not paid because it was discharged; the debtor should be treated the same as if the prior student loan had never existed.

H.R. 835, 103rd Cong. § 313 (1994). The Defendant contests Congress' claim that section 525(c) overrules *In re Goldrich* because the Defendant assumes Congress would have added student loans to the list of prohibited discrimination areas under 525(a) if that was its intent. This argument seems weak in light of the fact that the legislative history clearly identifies the result Congress sought to achieve. In fact, it is more likely that Congress created a separate section for student loan denial to reinforce its desire against discrimination.

■ The Defendant correctly points out, however, that Congress' reference to a debtor who once owed a student loan that was discharged, is not the same situation as the case at hand. The Defendant inter-

prets the statement as an indication that Congress intended to prohibit discrimination against only those debtors who had a student loan discharged and not those debtors seeking a new student loan. The more logical interpretation, though, is that Congress intended to prohibit discrimination against both. Regardless, when the legislative history is not consistent with the plain language of the statute, the plain language prevails. *See Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). The plain language of section 525(c) prohibits the denial of a student loan based on whether the applicant had ever filed for bankruptcy and is not limited to student loan debts that were discharged.

Admittedly, the Defendant makes a compelling point that the presumably deliberate difference in language between section 525(a) and section 525(c) is proof that denial is different from discrimination. Section 525(a) states:

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title . . .

11 U.S.C. § 525(a) (1997).

However, the Defendant does not address the issue of whether denial necessarily includes discrimination. Section 525(c) was enacted by the Bankruptcy Reform Act of 1994, section 313, and no courts have interpreted its meaning. Neither the parties nor the Court find any relevant caselaw. Only four cases even refer to section 525(c) and none of those cases analyze the section's application. Therefore, it is an issue of first impression. It is surprising that a significant statute impacting tens of thousands since 1994 has never been interpreted by a court in a reported decision.

From a purely factual standpoint, the Defendant's argument that federal regulations discriminate against, but do not mandate denial of, approval of student loans for debtors is illusory. Federal law makes eligibility for PLUS loans dependant on whether a parent has adverse credit history, as defined by federal regulations. *See* 20 U.S.C. § 1078-2(a) (1992). Federal Regulation, 34 C.F.R. § 682.201(b)(1), defines adverse credit history to include bankruptcy. Accordingly, the combination of this statute and the regulation authorize guarantors and lenders to deny student loans based on whether an applicant has filed bankruptcy. This violates the plain language of section 525(c), which states that a guarantor or lender "may not deny a grant, loan, loan guarantee . . . because the debtor . . . is or has been a debtor under this title." 11 U.S.C. § 525(c) (1997). Though discrimination may not always lead to denial, in this particular instance, discrimination is the equivalent of denial.

The facts of this case show the Debtor was denied the PLUS loan because of her bankruptcy status. The Department of Education presented two witnesses to refute the Plaintiff's contention. The first witness, Jeffrey Baker, was an employee of the Department of Education in the Program Development Division. He testified that he helped draft the Dear Colleague Letter that advised lenders of the effects of the new bankruptcy laws. Mr. Baker testified that Paragraph 7 of the Dear Colleague Letter explained that a discharge in bankruptcy still qualified as adverse credit after the 1994 amendment and that loans should be denied on that basis:

> Will bankruptcy still be a factor in determining if an applicant for a Federal PLUS or Federal Direct PLUS loan has an adverse credit history?

> Yes. An applicant for a PLUS loan under either loan program who has been the subject of a bankruptcy discharge

during the 5 years preceding the date of the applicant's credit report, continues to have an adverse credit history, and thereby ordinarily not eligible for the loan.

The Dear Colleague Letter conclusively shows the Department of Education's policy was to deny PLUS loans if the borrower had filed for bankruptcy within the previous five years.

The second witness for the Department of Education, Kevin DuPont, testified specifically that Ms. Taylor's second loan disbursement was canceled because Sallie Mae had been notified of Ms. Taylor's bankruptcy.[1] Consequently, it is clear the second disbursement of the original loan was denied because Ms. Taylor had filed for bankruptcy. She was instructed to reapply for the loan that had been approved and subsequently denied. It was only after the Debtor reapplied for the loan on March 18, 1997 that the denial was based on bankruptcy and delinquent credit accounts.

The denial of the second application also violated section 525(c) because it was based on the Plaintiff's bankruptcy status and a delinquent account that had been discharged. Mr. DuPont testified that Sallie Mae received notice of Ms. Taylor's discharge on March 4, 1997. (Tr. at 77, 17). Ms. Taylor sent a second application, which was received by Sallie Mae on March 18, 1997. (Tr. at 77, 23). The day the second application was received, Sallie Mae obtained a credit report from Trans Union. (Tr. at 80, 21–22). Mr. DuPont testified the second loan application was denied because the credit report showed

delinquencies to the City Bank of Childersburg greater than ninety days. (Tr. at 81, 24–25). The debt to City Bank of Childersburg was discharged on February 27, 1997. Therefore, Sallie Mae's rejection of the second loan application violated section 525(c)'s prohibition against denying a student loan because the debtor "has not paid a debt that is dischargeable in the case . . ." 11 U.S.C. § 525(c) (1997).

The Defendant argued at Trial that the credit report did not show the debt was discharged and, accordingly, it was reasonable for Sallie Mae to deny the loan without further investigation. On the contrary, the language of section 525(c) explicitly places a burden on the government or person engaged in a business that includes the making of student loans to investigate and determine whether the loan is dischargeable. The fact that the wording of section 525(c) includes debts that are "dischargeable" instead of simply discharged debts indicates the lender must make a determination as to whether the loan will be or could be discharged in the bankruptcy case. A credit report only has the capacity to show whether a debt has been discharged.[2] It does not and could not show whether a debt is dischargeable. Consequently, the lender has to look beyond the credit report to ensure it does not violate section 525(c). In the present case, the lender relied, to its detriment, solely on the credit report and denied the loan in violation of section 525(c).

The Defendant argues that a debtor can reapply for a loan that is denied by providing a co-signor or a statement from his or her creditors that the debts have been

---

1. Among other statements, Mr. DuPont testified "[t]hat is part of our procedures, that when we receive a bankruptcy notice that there is pending disbursements, we cancel them" (Tr. at 76, 11–13); "We advised the school that since the prom note was signed prior to the bankruptcy filing, the subsequent disbursement had to be canceled and to have the parent reapply for the funds" (Tr. at 76, 18–21). Mr. DuPont also answered "Correct" to the question of whether the second dis-

bursement cancellation was based on the applicant's bankruptcy. (Tr. at 84, 25).

2. The fact that a credit report sometimes notes that debts were discharged does not mean it is an authoritative source. In fact, in the present case the debt to the City Bank of Childersburg was not noted as discharged on the credit report despite the fact that it was discharged on February 27, 1997. (Tr. at 81, 24–25).

satisfied. There are two problems with this contention. First, the debtor is allowed to reapply after being denied, which is a violation of section 525(c). Second, the practical effect of the reapplication requirements is equivalent to denial. The debtor would not be able to provide adequate assurance from his or her creditors that the debts were satisfied unless the debtor had been discharged and had paid 100% of all debts through the bankruptcy. Though this does happen sometimes, it is often not true. Almost no Chapter 7 debtors pay 100% of all debts, and a small percent of Chapter 13 debtors pay all debts, but only after payments for five years. Consequently, most debtors would not be eligible under this option. The co-signor option forces the debtor to enlist another person to guarantee the debt. The student loan is still denied to the debtor but is approved to the co-signor. That, of course, presumes every debtor could find a co-signor. The practical effect of the education statute and the regulation is to deny student loans to anyone who has filed for bankruptcy.

The Court concludes the Defendant violated section 525(c) in two different instances. The first violation of section 525(c) occurred when Sallie Mae canceled the second distribution. The second violation occurred when Sallie Mae rejected the Plaintiff's second application. As applied by Defendant, the statute, 20 U.S.C. § 1078–2(a) (1992), and regulation, 34 C.F.R. § 682.201(b)(1), governing PLUS loans violates 11 U.S.C. § 525(c). Having established that the Defendant violated section 525(c), the Court must next determine what recourse is available to the Plaintiff.

### V. DAMAGES

■ The Plaintiff is seeking $25,000 in actual damages for emotional distress and $75,000 in punitive damages. Though section 106 abrogates sovereign immunity for proceeding under section 525, section 106(a)(3) specifically prohibits a court from awarding punitive damages against a governmental unit. Section 106(a)(3) states:

> The court may issue against a governmental unit an order, process, or judgment under such sections of the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages.

11 U.S.C. § 106(a)(3) (1997). Therefore, the Plaintiff's claim for punitive damages is barred.[3]

The Defendant also disputes the Plaintiff's ability to recover damages for emotional distress. The Defendant makes the assumption that the Plaintiff is attempting to recover for the tort of intentional infliction of emotional distress or negligent infliction of emotional distress. However, the Plaintiff's Amended Complaint states that the Plaintiff seeks to recover damages for emotional distress. Those are damages stemming from the violation of section 525(c) and not intended to be a separate cause of action. The issue then becomes whether the Plaintiff can recover emotional distress damages under section 525(c). As previously noted, there is virtually no caselaw interpreting section 525(c). Consequently, the Court must rely on analysis in similar situations, including violations of sections 525(a) & (b).

Section 525(b) prohibits discriminatory actions by a private employer against a person who has filed bankruptcy. Most of the cases discussing section 525(b) awarded actual damages in circumstances such as loss of employment and injunctive relief. In one case, *Bell v. Sanford–Corbitt–*

---

**3.** In the five years since enactment of § 525(c), Defendant's application of PLUS loans to debtors must have adversely impacted tens of thousands. Any punitive damage award would be very large, many multiples of the amount requested. As reviewed above, the Defendant intended to avoid the amendments of 1994 by bureaucratic legislation contrary to Congressional mandate. Defendant sought to reduce the benefits available to a debtor.

*Bruker, Inc.,* the District Court for the Southern District of Georgia upheld the Bankruptcy Court's award of $5,000 for emotional distress damages but did not discuss the authority for such an award. No. CV 186–201, 1987 WL 60286, at *5 (S.D.Ga.1987). The Defendant attempted to distinguish *Bell* in its Trial Statement because there was also a violation of the stay issue. The Defendant argued emotional distress damages are only appropriate, if at all, in cases involving violations of the automatic stay or the discharge injunction. The Plaintiff has not provided any authority to show she is entitled to emotional distress damages.

The Defendant compares damages for violations of section 525(c) to damages for violations of the automatic stay or discharge injunction. Courts are split over whether a plaintiff can recover emotional distress damages for violations of the automatic stay or discharge injunction. The 11th Circuit has not ruled on the issue. In *In re Poole,* the Bankruptcy Court for the Northern District of Georgia stated that "[a]llowance of actual damages in the amount of $411, in addition to the damages for emotional distress, is appropriate" against the defendant for violating the discharge injunction. 242 B.R. 104, 113 (Bankr.N.D.Ga.1999).

Other courts such as in *In re Matthews* have awarded damages for emotional distress that were found reasonable to compensate the plaintiff for stress suffered. 184 B.R. 594, 600 (Bankr.S.D.Ala.1995). The court stated:

Damages is a problematic issue in this case. The IRS's behavior was clearly inappropriate, but the actual damages suffered by the Matthews are not easily calculable. There were no medical bills and no expert opinion, or even personal testimony, of long-term physical harm. The effects are what are normally termed "mental anguish," except for the attorneys' fees incurred to prosecute this action and attempt to stop the IRS activities prior to this suit. A damage award [under §§ 362(h) ] must not be based on mere speculation, guess, or conjecture. As to damages, whether under §§ 105, 362(h) or 524(a)(2), the standard is basically the same. Once a party has proven that he has been damaged, he needs to show the amount of damages with reasonable certainty. . . . The Matthews were without $1,800 for one year; Mrs. Matthews quit a job due to her stress; the debtors vomited and cried; and their children were upset. Although not quantified in exact dollars, the proof showed damage was done and it should be compensated. The Court finds that $3,000 is reasonable compensatory damage for the loss of use of funds and stress suffered by the Matthews.

*Id.* at 600–01 (citations omitted). In *In re Davis,* the Bankruptcy Court for the Southern District of Alabama calculated the emotional distress damages at 150% of the plaintiff's out-of-pocket costs. 201 B.R. 835, 837 (Bankr.S.D.Ala.1996). The court stated:

In this case, it is clear the Debtors suffered some embarrassment due to the local nature of many of the returned checks. The Court does not believe damages to be as substantial as $2,000. The creditors already knew the Davises were in bankruptcy. Therefore, the Debtors precarious finances were known. However, inconvenience and some embarrassment did occur which the court will quantify at $300, 150% of the out of pocket costs.

*Id.* However, the court stated no reason for arriving at 150% as the appropriate calculation.

Other courts have refused to award emotional distress damages altogether unless the plaintiff showed medical evidence "to support the debtor's claim which shows that the debtor suffered something more than just fleeting or inconsequential distress, embarrassment, humiliation, and annoyance." *In re Aiello,* 231 B.R. 684, 691 (Bankr.N.D.Ill.1999). Moreover, the court

in *Holden v. United States* refused to award emotional distress damages until medical testimony was presented to support the plaintiff's claim. 226 B.R. 809, 812 (Bankr.D.Vt.1998).

■ Courts that have awarded emotional distress damages for violations of the automatic stay or discharge injunction have not presented any clear standards for their conclusions. Consequently, the Court is left to decide whether such damages can be awarded and, if so, the appropriate amount. Once again, section 525(c) provides no guidelines for its enforcement. Thus, any court confronted by a section 525(c) violation must decide what remedies can be used. In any section 525(c) violation, the Plaintiff's actual damages will likely be small. If the Plaintiff is forced to obtain a new loan, actual damages would certainly include any increase in the interest rate. However, if, as in the current situation, the Plaintiff did not have to pay a higher interest rate or was unable to attain a loan, there must be some sort of recourse for the section 525(c) violation.

■ The Plaintiff is entitled to be compensated for her injuries and damages. The only option available to courts is to allow emotional distress damages. As stated by the 11th Circuit in *Hardy:*

> The language of § 105 encompasses any type of order, whether injunctive, compensative or punitive, as long as it is necessary or appropriate to carry out the provisions of the Bankruptcy Code. Therefore, § 105(a) grants courts independent statutory powers to award monetary and other forms of relief ... to the extent such awards are necessary and appropriate to carry out the provisions of the Bankruptcy Code.

97 F.3d at 1389–90. This Court is in agreement with the *Matthews* and *Davis* courts and finds that emotional distress damages can be awarded against creditors

for violations of the Bankruptcy Code. Accordingly, the Court finds that $12,000 is a suitable amount to compensate the Plaintiff and enforce the provisions of section 525(c).[4]

## VIII. ATTORNEY'S FEES

The Defendant contends any attorney's fee award must be in compliance with 28 U.S.C. § 2412. Section 106(a)(3) of the Bankruptcy Code states:

> The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

11 U.S.C. § 106(a)(3). Section 2412(d)(2)(a) states:

> (2) For the purposes of this subsection—

> (A) "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees. The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the

---

**4.** The Defendant has not requested any credit for the damages recovered from the Chase Manhattan Bank. In any event, these damages are distinct from those paid by Chase, which does not benefit from the limitations on damages against the Defendant.

limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.

28 U.S.C. § 2412(d)(2)(A). The 11th Circuit in *Jove Engineering, Inc. v. I.R.S.* agreed that attorney's fee awards must be in compliance with the Equal Justice Act. 92 F.3d 1539 (11th Cir.1996). Both *Jove* and *In re Hardy* state that attorney's fees must be awarded according to the limitations set forth in section 2412(d)(2)(A). *See id.; see also In re Hardy,* 97 F.3d 1384 (11th Cir.1996). However, neither case mentioned the need for the prevailing party to submit detailed billing, etc. for section 2412(d)(1)(B), which is not cited in section 106. Consequently, it is unclear whether the Plaintiff would have to comply with section 2412(d)(1)(B), or if section 106 merely requires attorney's fees be awarded according to the limitations of section 2412(d)(2)(A).

The Plaintiff did not address the issue of attorney's fees at the Trial. The Plaintiff has never rebutted the Defendant's claim that she must follow the procedures outlined in section 2412(d)(1)(B). The Court presumes the Plaintiff intends to comply with the Defendant's request. Therefore, the Court need not consider whether such compliance is mandated under the Bankruptcy Code.

A Final Order consistent with this Opinion will be entered after an application for attorney's fees.