In re Edwin H. ATKINS, Jr., Debtor.

Edwin H. Atkins, Jr., Plaintiff,

v.

United States of America, Defendant.

Bankruptcy No. 86–10604.
Adversary No. 00–90144.

United States Bankruptcy Court,
N.D. New York.

June 18, 2002.

Selbach & Viencek, L.L.P., Syracuse, New York, for plaintiff, Mark F. Viencek, of counsel.

U.S. Attorney General, Albany, New York, for defendant, Diane Cagino, Assistant U.S. Attorney.

## MEMORANDUM–DECISION AND ORDER

ROBERT E. LITTLEFIELD, Jr., Bankruptcy Judge.

The current matter before the court is the request of Edwin H. Atkins ("Plaintiff" or "Debtor") for damages against the United States of America ("Defendant" or "Government") based on the Defendant's alleged violation of the permanent injunction provided by 11 U.S.C. § 524. The court has jurisdiction via 28 U.S.C. §§ 157(b)(2)(A) and (G) and 1334(b).

## FACTS

The court finds the following facts taken directly from the stipulation of the parties:[1]

1. On or about May 24, 1979, the United States of America, acting through the Farmers Home Administration, United States Department of Agriculture entered into a transaction with the Plaintiff whereby money was loaned to Plaintiff in exchange for a mortgage on Plaintiff's real property located at R.D. # 2, Johnston, New York.

2. The Plaintiff is the Debtor in Chapter 7 Bankruptcy Case No. 86–10604 which was filed on April 25, 1986.

3. Plaintiff listed the Government as a creditor in said Bankruptcy case in connection with the debt secured by said mortgage.

4. The Government received notice of the commencement of said Bankruptcy case.

5. On a number of occasions, the Plaintiff communicated his intention to surrender the property to the Government.

6. On January 30, 1987, the Bankruptcy Court issued Plaintiff a Chapter 7 Discharge wherein the debt owed by Plaintiff to Government in connection with said mortgage was discharged. On January 30, 1987, the Bankruptcy Court mailed the Government a copy of said Discharge, which was received by the Government.

7. In an effort to assist the Government in minimizing its losses concerning the property, the Plaintiff cooperated with the Government in attempting to transfer his interest in the property to it.

8. In or about March of 1987, the Government intercepted and seized the Plaintiff's 1986 Federal Income Tax Refund in the amount of $677.00 in an attempt to offset the debt Plaintiff discharged in his Bankruptcy case. Plaintiff was due said amount from the Internal Revenue Service as the result of a $677.00 overpayment he had made in connection with his 1986 income taxes.

9. The Government never returned to the Plaintiff said 1986 tax refund in the amount of $677.00.

10. On or about November 17, 1987, the Government sent a letter to the Bankruptcy Court requesting a copy of the Plaintiff's Bankruptcy Petition.

11. On or about May 31, 1988, the Government sent Plaintiff a letter which Plaintiff received demanding payment from Plaintiff of $6,005.50 past due in connection with the discharged debt, and advising Plaintiff that "[f]uture contact regarding this matter will re-

---

1. The court has redacted mention of exhibits attached and made minor, nonsubstantive revisions. Although lengthy, the totality of the stipulated facts is necessary to understand the breath of the problem.

quire you to come into the office." The May 31, 1988 letters bears the notation "SECOND NOTICE" and was the second notice sent by the Government and received by the Plaintiff demanding payment from Plaintiff of the discharged debt.

12. On or about June 23, 1988, the Government sent Plaintiff a letter which Plaintiff received demanding payment from Plaintiff of "6,471.40 past due" in an attempt to collect the discharged debt. Despite the fact that the Plaintiff had made clear to the Government his intention of surrendering the property to same, and, in fact, was in the process of assisting the Government in connection with said voluntary transfer, said letter dated June 23, 1988, stated as follows: "If you are willing to cooperate and want to keep your home, you must contact this office within 10 days from the date of this letter ... IMPORTANT—If we do not hear from you within 10 days, your account will be referred to the District Office." Said letter bears the notation "FOURTH NOTICE" and was the fourth such notice sent to Plaintiff in an attempt to collect the discharge debt.

13. On or about July 6, 1988, the Government sent Plaintiff a letter which Plaintiff received demanding payment and threatening foreclosure. Said letter bears the notation "FIFTH NOTICE."

14. On or about October 11, 1988, the Government sent Plaintiff a letter which Plaintiff received in which it threatened to intercept further income tax refunds from Plaintiff in an attempt to offset the discharge debt, then threatened to report his "account" to "consumer credit reporting agencies." One side of said letter indicated that the Plaintiff was "more than 3 months delinquent on a debt owed to the [Government]." The other side of said letter indicated that Plaintiff was 16 payments delinquent and that the amount of said delinquency was $7,403.50.

15. On or about December 2, 1988, the Government sent Plaintiff a letter by certified mail, return receipt requested which Plaintiff received wherein Plaintiff was advised that he was required to complete and return a budget and financial statement to the Government within 10 days of the date of said letter.

16. The Plaintiff alleges that in 1988, an employee of the Government called the Plaintiff in an attempt to collect the discharged debt; that when the Plaintiff indicated that the debt had been discharged in his Bankruptcy case, said employee said "that's not true"; and that because of this and because of all other actions taken by the Government, the Plaintiff became fearful that even though he had filed bankruptcy and lost his home, he still owed the discharged debt. The Government denies these allegations based on lack of knowledge sufficient to form a belief.

17. On or about February of 1989, Plaintiff was denied an income tax refund anticipation loan at Mellon Bank. Said Mellon Bank stated in a letter dated 02/15/89 concerning said denial that the reason for the denial is that "the Internal Revenue Service informed [Mellon Bank] that they will not direct deposit [Plaintiff's] tax refund to [Plaintiff's] account at Mellon Bank ..."

18. On or about February 17, 1989, the Government sent Plaintiff a letter by certified mail return receipt request-

ed which was received by Plaintiff wherein the Government demanded full payment of the discharged debt consisting of "$36,566.80 unpaid principal and $7,327.84 unpaid interest as of February 17, 1989, plus additional interest accruing at the rate of $9.0165 per day thereafter ..." The Government demanded in said letter full payment of said amount by March 17, 1989.

19. On or about March 6, 1989, Plaintiff sent the Government a letter and again advised the Government that he had filed a Bankruptcy Petition. Plaintiff also notified the Government of the name and address of his attorney and advised the Government that he had already transferred his interest in the property and turned the keys to the property over to the Government.

20. In February or March of 1989, as threatened, the Government intercepted and seized the Plaintiffs 1988 income tax refund in the amount of $1386.00.

21. On or about March 19, 1990, the Government sent Plaintiff a letter which Plaintiff received wherein the Government demanded payment of the discharge debt indicating that said debt was "$20.317 past due" and advising the Plaintiff that he was required to complete a household budget and to bring the same with his "payment coupon" to the Government's office on March 28, 1990, at 9:00 a.m.

22. The Government was contacted by Attorney Hallenbeck who demanded a return of the 1988 income tax refund the Government had seized. In its letter to Mr. Hallenbeck dated March 26, 1990, and in the memorandum enclosed therewith and referenced therein, the Government acknowledged that it should not have intercepted the 1988 tax refund and stated that the refund would be returned to the Plaintiff.

23. The Government did not return the Plaintiff's 1988 refund in the amount of $1,386.00 until late April of 1990 when it mailed the refund to the Plaintiff on April 23, 1990.

24. On or about May 4, 1990, the Government sent the Plaintiff a letter which the Plaintiff received demanding payment on the discharged debt and indicating that said debt "is past due $22,757."

25. On or about September 19, 1990, the Government sent Plaintiff a letter which the Plaintiff received wherein the Government threatened to intercept his tax refund and report his account "to credit reporting agencies."

26. On or about September 20, 1990, the Government sent Plaintiff a letter by certified mail return receipt requested which Plaintiff received. Said letter demanded full payment of the discharged debt consisting of $45,924.42 unpaid principal and $13,540.98 unpaid interest, as of September 20, 1990, plus additional interest accruing at the rate of $10.8307 per day thereafter.

27. On or about March 26, 1991, the Government sent Plaintiff a letter which the Plaintiff received informing the Plaintiff that his "loan file" would be forwarded to the Government's "attorney and then on to the United States Attorney." Said letter also advised the Plaintiff to consider bringing the discharged debt current.

28. On or about January 22, 1993, the Government sent Plaintiff a letter which the Plaintiff received wherein

the Government stated: "The principal debt owed as of January 19, 1993 is $45,418.88, with subsidy recapture of $4,128.00 and interest in the amount of $22,879.53, for a total of $72,426.41. Interest continues to accrue at $11.1992 per day."

29. In or about February of 1993, the Government commenced a foreclosure action against the Plaintiff in the United States District Court for the Northern District of New York. The Government demanded that the Plaintiff acknowledge receipt of the Summons and Complaint by signing and returning an acknowledgment form. The Government threatened to collect costs against the Plaintiff if he did not return the acknowledgment. It was alleged that the Plaintiff must complete the acknowledgment and return it to the Government.

30. In Paragraph 13 of said Foreclosure Complaint, the Government claimed that the sum of $68,298.41 "[t]ogether with interest at the rate of 9% on principal and all advances from January 19, 1993, or at the daily rate of $11.1992 from that date" was "justly due" from the Plaintiff. This again led the Plaintiff to believe that he was still responsible for the discharged debt.

31. In Paragraph 9 of said Foreclosure Complaint the Government alleged that the Plaintiff had abandoned the property even though he had voluntarily given the keys to the property to the Government.

32. In the Foreclosure Complaint the Government sought recovery as against the Plaintiff for payments of taxes, hazard insurance, water and sewage charges and other municipal assessments and maintenance with respect to the property.

33. On or about October 19, 1998, the Government sent Plaintiff a letter which the Plaintiff received wherein the Government stated in reference to the discharged debt, "You have not paid the past due amount you owe the [Government] ..." In said letter, the Government threatened to take the Plaintiff's tax refund(s) to offset the discharged debt.

34. In February or March of 1999, the Government intercepted and seized the Plaintiff's 1998 income tax refund in the amount of $587.99 to offset the discharged debt. This was the third income tax refund intercepted and seized by the Government to offset the discharged debt.

35. On or about March 12, 1999, the Government sent Plaintiff a letter which the Plaintiff received wherein the Government advised the Plaintiff that it had seized the Plaintiff's 1998 refund for $587.99 "to satisfy in whole or in part [Plaintiff's] delinquent debt owed to the United States [i.e. the discharged debt]."

36. On or about July 31, 1999, the Government sent Plaintiff a letter which the Plaintiff received wherein the Government informed the Plaintiff that it was reporting the outstanding delinquency in connection with the discharged debt to credit reporting agencies.

37. The Government did not return the Plaintiff's 1998 refund in the amount of $587.99 until June 29, 2000, when it mailed said refund to the Plaintiff. The Plaintiff received said refund on July 5, 2000.

38. On or about August 12, 2000, the Government sent Plaintiff a letter which Plaintiff received wherein the Government informed Plaintiff of the following: "After careful consider-

ation, cancellation of the balance remaining on your debt [i.e., the discharged debt] has been approved."

39. At all times relevant to this case, the Government took the position that it had a right to collect the discharged debt based on the reaffirmation agreement that was signed by the Debtor before the filing of the petition and issuance of the discharge, but was never filed with the bankruptcy court.

## ARGUMENTS

The Plaintiff argues that the Defendant's conduct is cause for the following damages:

1) Compensatory damages of $150,000 [2] pursuant to 11 U.S.C. § 105(a) [3] and/or 11 U.S.C. § 524(a); [4]

2) A return of the Plaintiff's 1986 income tax refund with interest;

3) Payment of interest on Plaintiff's 1988 and 1998 income tax refund; and

4) Attorneys' fees and costs.

The Defendant counters in its post-trial brief by arguing that:

1) If the court finds it appropriate to award compensatory damages, the award should not exceed $5,000;

2) Attorneys' fees should not be recoverable but if the court is so inclined to "review, as it does with any fee application, not only what is reasonable but what could have been avoided by the

plaintiff." (Defendant's post-trial brief on damages p. 9.)

3) Interest should not be awarded "in as much as it relies on inapplicable sections [sic] of the Internal Revenue Code." (Defendant's post-trial brief on damages p. 9.)

## DISCUSSION

This case paints a portrait of a large bureaucracy running amuck. Reduced to its essence, we have a Plaintiff who realized he could not afford to keep his home and endeavored to surrender it to the secured lender, i.e., Farmer's Home Administration. The underlying note was discharged in the Debtor's Chapter 7. The Government received a copy of that discharge and then, for whatever reason, ignored it and engaged in fourteen years of ongoing "torture" [5] of this Plaintiff.

There is no rationalizing, explaining, excusing or defending the Government's actions. Government counsel stated during the evidentiary hearing, "I'm not going to defend what happened. I can't defend it .... [t]here was no question that the Government was wrong." (Tr. p. 9, lines 16–17, 19–20.) The problem with this case is how to quantify the damages. Government counsel at trial conceded, "the interest of the client right now is just to have the court award an amount." (Tr. p. 8, lines 14–15.) As strongly as this court feels that the Government should be pun-

---

2. In the conclusion to his reply brief, Plaintiff's request for damages increased to $200,000.

3. 11 U.S.C. § 105 is entitled "Power of court" and states, in part: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title . . .

4. 11 U.S.C. § 524 is entitled "Effect of discharge" and states, in part: (a) A discharge in

a case under this title—(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor whether or not discharge of such debt is waived . . .

5. As described by the Government's counsel at trial (Tr. p. 8, line 18.)

ished for its behavior, both parties agree that punitive damages are not available due to express statutory prohibition.[6]

## A. COMPENSATORY DAMAGES

■ This court discussed damages in *In re Alberto*, Case No. 98–14005 (Bankr. N.D.N.Y. Oct. 2000), *rev'd on other grounds*, 271 B.R. 223 (N.D.N.Y.2001), stating:

> Whether under §§ 105, 362(h), or 524(a)(2), the standard is basically the same. Once a party has proven that he has been damaged, he needs to show the amount of damages with reasonable certainty. (citation omitted). However, courts have recognized that damages from mental anguish can be difficult to prove. (citation omitted).

> While some courts have refused to award damages under section 362(h) because the debtor failed to introduce any medical evidence, other courts have imposed a less stringent standard when it is clear that the debtor suffered some appreciable emotional harm as a result of the stay violation. (citations omitted). This court agrees with the rational of the above cases and finds that emotional distress damages can be awarded against creditors for violation of the automatic stay. In addition, this court concurs with District Judge Nagle, in affirming the Bankruptcy Court, that in the appropriate case, this may be done without the necessity of medical testimony. (citation omitted). *See also In re*

*Ghostlaw,* Case No. 96–15146 (Bankr. N.D.N.Y. August 14, 1998).

In the instant case, the Debtor testified credibly to the stream of harassment as is reflected in the stipulated facts and the effect on him mentally and physically. The Debtor stated he was "paralyzed with fear." (Tr. p. 31, line 20; p. 32 lines 17–18; p. 56 lines 16–17.) He had difficulty sleeping. (Tr. p. 39, lines 1–25; p. 40 line 1; p. 56, lines 4–6; p. 63, line 10.) This aspect was corroborated by his wife. (Tr. p. 67, lines 4–6.)

The Government's misfeasance malfeasance began prepetition with a bizarre attempt to concoct a reaffirmation agreement. Such an agreement must involve a debtor[7] and be filed with the court. There was no bankruptcy case and therefore no debtor when the agreement was allegedly executed and it was never filed with the court. This improper agreement is the basis that the Government looks to as the justification for their many actions. (Defendant's post-trial brief p. 9.) The Government seized three tax refunds totaling $2,650.99; $677.00 of that has been held by the Government for fifteen years. Like some reverse Robin Hood, taking from the poor and giving to the rich, the Government still has not returned the balance of the seized refund.

From the stipulated facts, there are at least fourteen[8] written communications with the Debtor post-discharge. Some are standard collection letters, demanding from $6005.50 to $72,426.41; others threaten seizure of tax refunds, reporting the

---

6. 11 U.S.C. § 106 is entitled "Waiver of sovereign immunity" and states, in part: (a)(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages ...

7. 11 U.S.C. § 101(13) defines a debtor as a "person ... concerning which a case under this title has been commenced."

8. Exhibit 2 to the Plaintiff's post trial brief analyzes the Government's relationship with the Debtor and posits more than three times as many violations of 11 U.S.C. § 524.

discharged debt to consumer credit report agencies, referral to the United States Attorney, foreclosure and/or a demand that Debtor report to the Government's office.

The Debtor also testified credibly to a telephone call with the Government wherein the Government's agent told the Debtor his obligation had not been discharged. The effect on the Debtor, a non-lawyer, was a growing belief that he still owed the Government money on the discharged debt. The Debtor testified "that whatever amount that was incurred on this home, that I was responsible for" (Tr. p. 53 line 7-10.) and "that I was responsible for that debt." (Tr. p. 54, line 13.1.) Further, the Debtor testified that the Government's seizure of tax refunds delayed the construction of his family's new home. (Tr. p. 20, lines 4-19, p. 23, lines 16-25; p. 24, lines 1-3, p. 40; lines 23-25, p. 41; lines 1-3, p. 40; lines 13-21, p. 47; lines 11-13; p. 58, lines 8-23.)

Other courts have also struggled with the issue of damages. The court in *In re Taylor*, 252 B.R. 201 (Bankr.N.D.Ala.2000) awarded $1,200 against the government for a violation of 11 U.S.C. § 525(c)(1).[9] In that case the court found that the plaintiff suffered headaches, loss of sleep and lack of concentration. Plaintiff withdrew and often cried. Her performance as a high school math teacher suffered. *Id.* at 204.

In *Matthews v. United States*, 184 B.R. 594, 600 (Bankr.S.D.Ala.1995), the debtors filed a chapter 7 on May 4, 1992; an IRS obligation was subsequently discharged on October 2, 1992. Post-filing, the IRS sent two notices of intent to levy. Post-discharge, the IRS seized two tax funds total-

ing $1,793 which the IRS held for less than a year. Attendant with the seizure were notices of "final seizure," intent to levy and assignment of tax liability for collection. The court stated:

> The Matthews were without $1,800 for one year; Mrs. Matthews quit a job due to her stress; the debtors vomited and cried; and their children were upset. Although not quantified in exact dollars, the proof showed damage was done and it should be compensated. The Court finds that $3,000 is reasonable compensatory damage for the loss of use of funds and stress suffered by the Matthews ... *Id.* at 601.

In *In re Davis*, 201 B.R. 835 (Bankr. S.D.Ala.1996), the debtors filed a chapter 7 on September 8, 1995 and properly scheduled the IRS. Post-filing the IRS sent three collection letters and then four notices of intent to levy. Subsequently, the IRS levied on the debtors' bank account resulting in $467.61 being sent to the government. When contacted by one of the debtors, the IRS restored the levied funds within one day, however the levy resulted in bounced checks to local merchants with whom they had done business for a long time. The debtor's alleged damages of $200 for NSF check charges and $2,000 for "trauma and embarrassment and the ordeal of worrying in straightening the problem out." The court ruled:

> In this case, it is clear the Debtors suffered some embarrassment due to the local nature of many of the returned checks. The Court does not believe damages to be as substantial as $2,000. The creditors already knew the Davises were

---

9. Section 525 is entitled "Protection against discriminatory treatment" and section (c)(1) states, in relevant part: A governmental unit that operates a student loan grant or loan program ... may not deny a grant, loan, loan guarantee, ... to a person that is or has been a debtor under this title ... because the debtor or bankrupt is or has been a debtor under this title ... has been insolvent before the commencement of a case under this title ... or has not paid a debt that is dischargeable in the case under this title ...

in bankruptcy. Therefore, the Debtors precarious finances were known. However, inconvenience and some embarrassment did occur which the court will quantify at $300, 150% of the out of pocket costs. *Id.* at 837.

In *Matter of Flynn,* 169 B.R. 1007 (Bankr.S.D.Ga.1994), the debtor filed a chapter 13 on April 17, 1992 which properly scheduled the IRS. Post-filing, the IRS levied on the debtor's bank account which lead to the following consequences for the debtor:

First, because the Debtor learned that she could not access her bank account and because she had very limited cash on hand, she was forced to cancel a birthday party that she had planned for the eleven-year-old son on January 16, 1993. This fact added to the distress that she originally experienced upon receipt of the letter from NationsBank informing her of the levy. She spent the entire three day weekend in a state of agitation, what she described as being "in a wreck," worried specifically that her rent and other checks would be dishonored by the bank. She subsequently received notice that several checks issued prior to January 15th, at a time when her account held adequate funds to cover the checks, were dishonored because the checks were presented for payment during the period of time that her account was frozen ... In each case, the bank returned the item to the payee of the check and charged $20.00 directly to the Debtor for the dishonor. Additionally, Debtor was required, in making good on the dishonored checks, to pay an additional $20.00 insufficient fund charge to each of the payees. All told, Debtor incurred $120.00 in "NSF" charges. *Id.* at 1010–11.

As a result of the above, the debtor requested, among other things, actual damages of $588.55 and compensatory damages of $25,000 for "mental embarrassment, humiliation, and anxiety." *Id.* at 1011. The court found:

Although Debtor apparently did not suffer any out-of-pocket medical expenses or long-term physical or emotional harm as a result of the IRS' wrongful levy, the evidence was uncontradicted that she was forced to endure the stress of knowing that a number of her checks would bounce and dealing with those payees, the emotional trauma of having to cancel a planned birthday party for her child, and the humiliation of being unable, without considerable difficulty and commotion, to negotiate a check for groceries at her neighborhood supermarket. These natural and powerful emotional reactions cannot be dismissed as "fleeting" or "inconsequential." The overpowering sense of humiliation, embarrassment and shame occasioned by the levy and its consequences was only exacerbated by the Debtor's knowledge that she should have been spared these indignities because of the dictates of federal law which her attorney had guaranteed would protect her during her Chapter 13 case. Accordingly, I find it appropriate to award Debtor $5,000.00 in actual, compensatory damages due to her emotional distress. (Citations omitted.) *Id.* at 1023.

Finally, in *Fleet v. Kaneb,* 196 F.3d 265 (1st Cir.1999), the creditor filed a foreclosure action under the mistaken belief that a lift stay order had been granted. After the error was pointed out, the bank put the foreclosure "on hold" for six weeks before dismissing the suit. During the life of the suit, a foreclosure notice was published in the local paper and as a result the debtor, an eighty-five year old widower, became persona non grata; he was avoided and not invited to social outings. The

Bankruptcy Court awarded $25,000 [10] for the mental anguish which was affirmed by the BAP.

The First Circuit affirmed, stating that the debtor:

> [t]estified about the emotional distress he experienced because of these changes in his life. "[I]ts very irritating. I don't sleep well. My eating habits have changed. I—I don't feel that ambitious about getting out and doing things and meeting people. It's—it's not a pleasant situation to be in.... I'm worried concerning where am I going to live." An honest accounting of actual damages under § 362(h) must include the psychological suffering of this eighty-five year old retired widower. We affirm the bankruptcy court's award of damages for mental anguish. *Id.* at 270.

 In trying to quantify the damages with the above case law in mind, the court must be vigilant to not allow the punitive to creep into the compensatory. Additionally, a damages award must not be based on mere speculation, guess or conjecture, *Flynn, supra* at 1021 (citations omitted). However, as in the *Matthews* case, the proof demonstrated damage was done and should be compensated. Mr. Atkins did not have the physical manifestations of other cases, e.g., vomiting, crying, etc. and his wife testified that the Government's actions had no effect on their marriage. (Tr. p. 67, lines 18, 20.) However, the time line involved in this case dwarfs the other factual scenarios. Still, within that long time period, there are extended phases when no Government collection activity is apparent.

Upon detailed examination, the Government's action may be grouped into five subgroups:

1) March 1987: seizure of the 1986 tax refund;

2) May 1988 – March 1989: primarily written collection efforts leading to seizure of the 1988 tax refund;

3) March 1990 – March 1991: primarily written collection efforts;

4) January and February 1993: written collection activity leading to a foreclosure suit; and

5) October 1998 – July 1999: written collection activity and seizure of the 1998 tax refund.

The Plaintiff's wife put this case into perspective by summing up the physical manifestations on her husband by testifying:

> He seemed very stressed out. He would wake up a couple times through the night. He'd be off into a world of his own really. I could tell he was upset.... He was very worried, very upset that they keep bothering us. (Tr. p. 67, lines 12–2, 24–25.)

While the Plaintiff's request of $150,000 would be reasonable under a punitive heading to discourage future government transgressions of this sort, it is far too large to compensate for the emotional stress testified to within the compressed time periods as noted above. The court finds that $30,000 is appropriate and balances the *wrong committed* versus the *harm caused*.

**B. RETURN OF SEIZED REFUND.**

 In a stunning display of apathy, ignorance or arrogance, the Government's wrongful seizure of Plaintiff's 1986 tax refund of $677 has never been addressed, much less rectified. Defendant's post-trial

---

10. On appeal, the bank raised, for the first time, whether mental anguish requires corroborating medical testimony. Both the BAP and the First Circuit declined to rule upon this issue because it was not raised at the trial level.

brief on damages makes no mention of Plaintiff's demand for return of the refund. In its answer to the complaint, the Government asserted affirmative defenses regarding the 1988 and 1998 tax refunds but not the 1986 tax refund. As such, with no affirmative defense and no statutory or case law offered post-trial, the Government has consented to the relief requested. The Government is directed to refund the 1986 tax refund of $677 to the Debtor.

## C. INTEREST ON REFUNDS.

The Plaintiff has requested interest to compensate him for the wrongful retention of the tax refunds. He points to 26 U.S.C. § 6343(c) as authority for the award. That section is entitled "Authority to release levy [11] and return property" and states, in relevant part:

(b) Return of property. If the Secretary determines that property has been wrongfully levied upon, it shall be lawful for the Secretary to return—...

(2) an amount of money equal to the amount of money levied upon, ...

(c) Interest. Interest shall be allowed and paid at the overpayment rate established under section 6621—

(1) in a case described in subsection (b)(2), from the date the Secretary receives the money to a date (to be deter-

mined by the Secretary) preceding the date of return by not more than 30 days, or ...

Plaintiff suggests that the judgment of the court will suffice as a substitute for the determination of the Secretary. The Government in its post-trial brief states interest should not be allowed because the Debtor's statutory authority is "inapplicable."

Pursuant to *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), the Government is immune from an award of interest unless there is an express waiver of sovereign immunity. This court does not interpret § 6343(c) as such an express waiver. Rather, § 6343 requires the Secretary to release a lien if certain conditions are met and confers discretion upon the Secretary to return property wrongfully levied upon.[12] If property is returned, then interest would be paid. As Plaintiff offers no other statutory or case law authority for an award of interest, his request is denied.

## D. ATTORNEYS FEES.

Plaintiff requests attorneys' fees via 11 U.S.C. § 106(a)(3) [13] and 28 U.S.C. § 2412(d)(2)(A).[14] In addition, based upon

---

**11.** 26 U.S.C. § 7701 defines levy as including the power of distraint and seizure by any means.

**12.** Section 6343(b) makes it lawful to return wrongfully levied property, but does not mandate it.

**13.** 11 U.S.C. § 106 states in relevant part:
(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
(1) Sections 105, ... 524 ...
(2) The court may hear and determine, any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections ... including an order or judgment awarding a money recovery ... Such order or judgment for costs or fees under this title ... against any governmental unit shall be consistent with the provisions and limitation of section 2412(d)(2)(A) of title 28.

**14.** Title 28 of the United States Code relates to the Judiciary and Judicial Process. Chapter 161 is entitled "United States as Party Generally" and section 2412 pertains to costs and fees. Subsection (d)(2)(A) states: fees and other expenses includes the reasonable expenses of expert witnesses, the reasonable

the spurious reaffirmation agreement, Plaintiff argues that Defendant committed a fraud upon the Plaintiff and the court and this justifies the finding of a special factor within the ambit of § 2412(d)(2)(A). Assuming fees are appropriate, such a finding would allow this court to exceed the $125 cap in the statute. Plaintiff also requests a cost of living allowance on any fee award.

Defendant counters by arguing that fees should not be allowed because there is no statutory authority for such an award. Alternatively, the Defendant states that any fee awarded should reflect that if Debtor's counsel had become involved earlier, the problem would not have been as complicated and fees would have been less.

This court is given specific authority to award attorneys' fees in certain actions brought under the Code, e.g., 11 U.S.C. § 362(h), 11 U.S.C. § 523(d), and F.R.B.P. 9011. Also, virtually any action involving the Internal Revenue Service has the possibility of attorneys' fees via 28 U.S.C. §§ 7430–33. However, there is no specific statutory power to confer attorneys' fees in either section 105 or 524.

11 U.S.C. § 106 provides an explicit waiver of sovereign immunity to 11 U.S.C. §§ 105 and 524 and provides further that the court may determine any issue arising under those sections including applicable costs or fees. Thus, if attorneys' fees are appropriate under either section, they would be properly chargeable to the Farmer's Home Administration. However, the Title 28 reference in § 106 merely pro-vides clarity to certain expenses if they are awarded. Nowhere in § 2412(d)(2)(A) is this court given authority to actually award fees; that authority must emanate from the Bankruptcy Code itself. Thus, the question remains, are attorney fees permissible under either section 105 or 524?

■ Generally, a prevailing party may not collect attorneys' fees from the loser of the litigation, the so-called "American Rule." However, a court may assess attorneys' fees for the willful disobedience of a court order or if the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. *Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Thus, if either of these judicially created exceptions apply, 28 U.S.C. § 2412(d)(2)(A) via 11 U.S.C. § 106 would permit the assessment of fees against the Government.

### 1) Willful violation of a court order.

■ The discharge injunction put in place pursuant to 11 U.S.C. § 524(a) is an order of the bankruptcy court whose violation is punishable by the imposition of civil sanctions. *In re Cherry*, 247 B.R. 176, 187 (Bankr.E.D.Va.2000). (collecting cases). There is no disagreement that the Government violated the 11 U.S.C. § 524 discharge injunction. As discussed above, there was no excuse for the Government's actions, then or now. They were served with the discharge and then reminded of

cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees. The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States: and (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.

that fact along the way. For whatever reason, the Government chose to ignore it. The willful violation of the injunction opens the door to attorneys' fees.

## 2) Bad faith.

The record is replete with evidence sufficient to support a bad faith finding, including:

—the events surrounding the preparation and execution of the document erroneously referred to as a reaffirmation.

—the Government's seizure of the a tax refund in 1987, applying it to the discharged debt and never returning it.

—the Government's numerous post-discharge attempts to collect to the Debtor over many years.

—an agent of the Government telling the Debtor his debt had not been discharged.

Therefore, attorneys' fees are appropriate under the bad faith exception as well.

Debtor's Counsel has submitted time records as follows:

a) Attorney Selbach's Time Records for the period 9/30/99 thru 5/29/01 totaling 5.7 hours. (Exhibit 3 of Plaintiff's brief.)

b) Attorney Viencek's Time Records for the period 8/4/00 thru 5/29/01 totaling 73.9 hours. (Exhibit 3 of Plaintiff's brief.)

c) Attorney Viencek's Time Records for the period 6/4/01 thru 7/17/01 totaling 10.4 hours. (Exhibit A of Plaintiff's brief.)

d) Attorney Selbach's Supplemental Time Records totaling 2.4 hours. (an-nexed to Attorney Selbach's Declaration dated July 25, 2001.)

e) Attorney Viencek's Time Records for the period 7/18/01 thru 7/25/01 totaling 2 hours. (annexed to the July 25, 2001 Declaration in support of application for attorneys' fees and expenses.)

Total hours are 94.4.[15] In examining these time records of Debtor's counsel, the services rendered were reasonable under the totality of circumstances in this case and are thus allowed.

The court declines to find that any special factors exist allowing an augmentation of the $125 fee allowed by statute, agreeing with the Fifth Circuit's analysis in *Cervin v. Commissioner of Internal Revenue*, 200 F.3d 351 (5th Cir.2000) (citing *Cassuto v. Commissioner*, 936 F.2d 736, 744 (2d Cir.1991)). The finding of a special factor based on the alleged fraud and bad faith of the defendant would be, in essence, the imposition of punitive damages which is forbidden by the statute. However, a cost of living allowance is appropriate and thus is approved. The Second Circuit has held that the phrase "cost of living" should be given its ordinary meaning and should be measured by the Consumer Price Index (CPI) and changes therein. *Harris v. Sullivan*, 968 F.2d 263, 265 (2nd Cir.1992).

The attorney time records break down as follows: .5 hours in 1999, 15.2 hours in 2000, and 78.7 hours in 2001. The attorney fee provided by statute should only be increased by the corresponding CPI for each year in which the legal work was performed. *Kerin v. United States Postal Service*, 218 F.3d 185, 194 (2nd Cir., 2000). Applying the CPI formula as espoused by the Debtor's counsel[16] and not contradict-

---

**15.** If there are additional hours not included, Plaintiff's attorney has thirty days from the date of this decision to submit them to this court for review.

**16.** The 2001 cost of living was calculated only through April 2001. If Plaintiff's counsel requests any additional hours, he is directed to submit the year end CPI increase for 2001.

ed by the Government, results in allowed fees of:

| | | | |
|---|---|---|---|
| 1999 | $135.11 per hour × .5 hours = | $ | 67.56 |
| 2000 | $139.69 per hour × 15.2 hours = | $ | 2,123.29 |
| 2001 | $142.03 per hour × 78.7 hours = | $ | 11,177.76 |

Total fees $13,368.61

Finally, in the Declarations in Support of Application for Attorney's Fees and Expenses, Plaintiff's counsel requests expenses of $155 involving the retrieval and reopening of the underlying chapter 7 citing to 28 U.S.C. § 2412(d)(1)(A). However, 11 U.S.C. § 106 only refers to § 2412(d)(2)(A), not (d)(1)(A). Section 2412(d)(2)(A) does not provide for the type of expenses Plaintiff seeks and thus the request for the $155 is denied.

In summary, the court awards as against the Defendant the following amounts:

1) $30,000 in compensatory damages;

2) $677 for the 1987 tax refund; and

3) $13,368.61 in attorneys' fees.

The Plaintiff's requests for interest on the tax refunds, a finding of special factors to increase the attorneys' fees and for expenses of $155 are denied.

It is so ORDERED.