**In re Osman/Sanela PERVIZ, Debtors.**

No. 02–35202.

United States Bankruptcy Court, N.D. Ohio.

Nov. 20, 2003.

Jerry P. Purcel, Toledo, OH, for debtors.

Andrew J. Hubbs, Potestivo & Associates, Sterling Heights, MI, Beth Ann Schenz, Weltman, Weinberg & Reis Co. LPA, Barbara Friedman Yaksic, McGlinchey, Stafford PLLC, Cleveland, OH, for creditors.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after an Evidentiary Hearing on the Debtors' Motion to Show Cause Against Ocwen Federal Bank for Violation of Stay. Present at the Hearing were the Debtors, Osman and Sanela Perviz, the attorney for the Debtors, Jerry Purcel, and the attorney for Ocwen Federal Bank, Mark Bredow. At the Hearing, the Debtors asked that this Court award them attorney fees in the amount of $2,555.00, and damages, inclusive of punitive damages, in the amount of $10,000.00 for Ocwen Bank's Postpetition and Postdischarge collection activities. After considering the matter, the Court, for the reasons that will now be explained, finds that the evidence supports the Debtors' position, and thus judgment will be rendered in the amounts requested.

### FACTS

The Debtors, Osman and Sanela Perviz (hereinafter referred to collectively as the "Debtors"), live together with their three young children and a parent of one of the Debtors. The Debtor, Sanela Perviz, is presently employed at Wal–Mart; while the Debtor, Osman Perviz, is unemployed on account of a disability.

As security for a home loan, Ocwen Federal Bank (hereinafter referred to as "Ocwen") obtained a mortgage interest in the Debtors' residence. During the first part of the year 2002, the Debtors became

delinquent, by at least a couple of monthly payments, on their loan obligation to Ocwen. Based upon this delinquency, Ocwen declined to accept the tender of any future payments.

On August 8, 2002, the Debtors filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In their petition, the Debtors listed Ocwen as a secured creditor holding a claim valued at $50,000.00. (Doc. No. 1, Schedule D). Notice of the Debtors' bankruptcy petition was sent to a Post Office Box Ocwen utilizes as its designated location for the receipt of mortgage payments. (Cr.Ex. A). Additionally, with respect to Ocwen's secured claim, the Debtors listed the law firm of Weltman, Weinberg, & Reis, who were also provided with notice of the filing of the Debtors' bankruptcy petition. (Doc. No. 2).

On December 6, 2002, an order of discharge in the Debtors' bankruptcy case was entered in accordance with 11 U.S.C. § 727. (Doc. No. 10). Notice thereof, was again sent to the address utilized by Ocwen for the receipt of payments. (Doc. No. 11). Exactly six months later, on June 6, 2003, the Debtors filed their instant Motion for Violation of Stay based upon both postpetition and postdischarge collection activities undertaken by Ocwen. (Doc. No. 17). As it pertains to these collection activities, the evidence produced at the Hearing revealed the following relevant factual information; these facts, as listed below, shall constitute this Court's findings of fact pursuant to Bankruptcy Rules 7052(a) and 9014(c).

Since filing for bankruptcy, the Debtors have received phone calls, numbering in the hundreds, regarding their loan obligation with Ocwen. On some days, up to eight phone calls would be made to the Debtors regarding their past due account with Ocwen. Although the Debtors could not specify each exact date and time in which the phone calls occurred, the Debtor, Sanela Perviz, could recall the specific names of some of the parties who regularly made the calls. In addition, Mrs. Perviz specifically recalled *that shortly after January 3, 2003, the date on which the Debtors vacated the property against which Ocwen held its mortgage interest, they were again contacted by Ocwen at their new place of residence.*

On the majority of occasions, Mrs. Perviz answered the phone calls initiated by Ocwen, which usually lasted no more than ten seconds. During many of these phone conversations, Mrs. Perviz, in addition to informing the caller of their pending bankruptcy, told the caller to contact her attorney, Mr. Purcel. In doing so, Mrs. Perviz would give the caller both the name of her attorney and his phone number. Based upon the time of the day in which many of the phone calls were made, Mrs. Perviz, who works second shift, had her sleep disturbed. On account of the disruption of her sleep, Mrs. Perviz was prescribed a medication for nervousness, the cost of which was covered, for the most part, by her employer-maintained health insurance.

In addition to telephone calls, after filing for bankruptcy, numerous correspondences were sent by Ocwen to the Debtors regarding their loan obligation. As presented to the Court, these correspondences may be grouped into four categories: (1) account statements; (2) matters regarding insurance; (3) correspondences from a legal representative of Ocwen; and (4) a miscellaneous correspondence. The substantive contents of these correspondences, grouped by the four different categories, are as follows:

**Account Statements**

-A Statement dated April 7, 2003, setting forth an amount due of $6,258.10. (Ex. No. 3).

-A Statement dated May 19, 2003, setting forth an amount due of $9,797.57. (Ex. No. 9).

In both of these account statements, the account-debtor was directed to read certain information concerning if they had filed for bankruptcy. This information provided, among other things, that if a discharge had been entered, the account-debtor was not personally liable for the loan obligation, but may still be subject to foreclosure proceedings. Similarly, the information provided that once the automatic stay is relieved, Ocwen may exercise its right to obtain the property secured by its mortgage. The Debtors were also provided with a phone number to call if they wanted Ocwen to discontinue sending the account statements.

## Insurance Matters

-An insurance payment request letter dated April 21, 2003. In this letter, it is set forth that if there is a lapse in the coverage provided by Debtors' insurance company, they will be responsible for a $493.00 charge for force place insurance. (Dr. Ex. No. 4). This payment request letter was then followed by a second notice dated May 16, 2003, wherein it was again reiterated that the Debtors would be responsible for any charge incurred by Ocwen on account of a lapse in insurance. (Dr. Ex. No. 7).

-A notice dated June 6, 2003, informing the Debtors that, at their expense, Ocwen had obtained force place insurance. (Dr. Ex. No. 11.).

-A letter dated July 24, 2003, informing the Debtors that the force place insurance had been terminated as of July 1, 2003, but that they would be charged $206.65 for the time the coverage was in force. (Dr. Ex. No. 16).

## Correspondences from a legal representative of Ocwen

-Two letters from a law firm, dated May 2, 2003 and May 17, 2003, stating that it has been "authorized" by Ocwen to contact the Debtors regarding their loan obligation with Ocwen. In these letters it then goes on to state, (presumably to comply with the F.D.C.P.A.) that it is "attempting to collect a debt and all information obtained will be used for that purpose." (Dr. Ex. Nos. 6 & 8).

-Three letters respectively dated June 3, June 25, and August 8, of 2003, from the law firm retained by Ocwen. In these letters, the just-above information was again restated. In addition, these letters conveyed two additional substantive matters: (1) that alternatives may be available regarding the payment of Ocwen's mortgage so as to prevent a foreclosure action; and (2) if the Debtors are in bankruptcy, the letter should not be construed as an attempt to collect a debt. (Dr. Ex. Nos. 10, 13 & 17).

## Miscellaneous

-A letter dated July 14, 2003, from Ocwen's Loan Servicing Department to the Debtors regarding a change in the terms of their loan. In this letter, (again presumably to comply with the F.D.C.P.A.), it is stated the Ocwen is "attempting to collect a debt and any information obtained will be used for that purpose." (Ex. No. 14).

Based upon both the continuous and numerous phone calls, together with the above correspondences, the Debtors contacted their attorney, Mr. Purcel, on many separate occasions. The billing statement submitted by Mr. Purcell shows that these correspondences began on December 5, 2002, and continued on a regular basis almost up until the time of the Hearing held in the instant matter. As a part of

his response to the Debtors' complaints, Mr. Purcel mailed to Ocwen (or its legal representative), numerous letters, the contents of which are more fully explained immediately below:

-A letter dated December 5, 2002, wherein it was advised that the Debtors had filed for bankruptcy and had or would be soon receiving their discharge. (Dr.Ex. No. 1).

-A letter dated May 1, 2003, wherein, after again stating that the Debtors had filed for bankruptcy, Mr. Purcel, in no uncertain terms, informed Ocwen that all contact with the Debtors should immediately cease. (Dr.Ex. No. 5).

-A cover letter dated June 10, 2003, wherein a copy of the instant Motion to Show Cause for Violation of the Stay was enclosed. (Dr.Ex. No. 12).

-A letter dated July 24, 2003, to Ocwen regarding that notices were still being sent to the Debtors, and making a demand upon Ocwen for damages in the amount of $5,000.00. (Dr.Ex. No. 15).

-A letter dated August 29, 2003, to Ocwen demanding that it desist making phone calls to the Debtors to collect on its debt. (Dr.Ex. No. 18).

-A letter dated September 29, 2003, to Ocwen's legal counsel. In this letter, Mr. Purcel refers to thirteen letters he had previously sent regarding his demand that Ocwen cease contacting the Debtors. In addition, Mr. Purcel states in this letter that, as late as September 9, 2003, his clients had informed him that they were still receiving phone calls from Ocwen regarding their prepetition debt. (Dr.Ex. No. 19).

No evidence, however, exists that Mr. Purcel ever personally called Ocwen or one of its legal representatives concerning the phone calls and letters received by the Debtors.

Altogether, Mr. Purcel billed the Debtors $2,555.00 (14.6 hrs. @ $175.00 per hr.) for the time he spent in attempting to get Ocwen to cease its collection activities. Also relevant to this case, it was brought to the Court's attention, and judicial notice may be taken of the fact, that the Debtors never reaffirmed on their debt with Ocwen; nor did the Debtors, in the statement of intention, indicate that they would reaffirm on their obligation with Ocwen.

### LAW

### 11 U.S.C. § 362. Automatic Stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of–

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]

(h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

### 11 U.S.C. § 524. Effect of discharge

(a) A discharge in a case under this title-

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

### DISCUSSION

Based upon the activities set forth above, the Debtors, in their Motion for Violation of Stay, seek to recover damages,

including attorney fees. As such a determination concerns a violation of the automatic stay and implicates a proceeding for the recovery of damages for violation of the discharge injunction, this matter is a core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(G)/(O). *See, e.g., In re Latanowich,* 207 B.R. 326, 332–33 (Bankr. D.Mass.1997). Thus, in accordance with 28 U.S.C. §§ 1334 and 157(a)/(b)(1), this Court has the jurisdictional authority to enter a final order and judgment in this matter.

■ Stated broadly, the automatic stay, which is set forth in 11 U.S.C. § 362(a), stops all collection activities related to the recovery of a prepetition debt against the debtor. The purpose of the stay is twofold: (1) to ensure the orderly liquidation of the debtor's bankruptcy estate; and (2) to provide the debtor with a breathing spell from creditors' collection efforts. *United States v. Nicolet, Inc.,* 857 F.2d 202, 207 (3rd Cir.1988). To effectuate its purpose, § 362(a) sets forth eight categories of proscribed conduct. Relevant to this case, is paragraph (6) of § 362(a) which enjoins a creditor from engaging in any act to collect or recover on a claim that arose before the commencement of the bankruptcy case. 11 U.S.C. § 362(a)(6). Acts encompassed within the scope of § 362(a)(6) may include, as occurred here, mailing letters and making phone calls if their purpose is aimed at collecting on a prepetition debt. *Ryan v. Ohio Edison Co.,* 611 F.2d 1170, 1175 (6th Cir.1979).

■ Once a violation of the stay occurs, paragraph (h) of § 362 provides that "[a]n individual injured by any willful violation of a stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." As used here, "willful" does not require any specific intent to violate the stay. Rather, "willful" has simply been interpreted to mean any intentional and deliberate act undertaken with knowledge—whether obtained through formal notice or otherwise—of the pending bankruptcy. *In re Kortz,* 283 B.R. 706, 712 (Bankr.N.D.Ohio 2002). *Patton v. Shade,* 263 B.R. 861, 866 (C.D.Ill.2001).

In opposition to any "willful" violation of the stay, Ocwen's raises what are essentially two different arguments which will be addressed in order. First, Ocwen argues that most of the statements sent to the Debtors were merely account statements or other technical statements and, were therefore, in no way intended as an action to collect a debt. In more detail, a legal memoranda submitted to the Court stated as follows: "... Ocwen can state that they periodically send notices to debtors not with the intent of pursuing a deficiency against them, but to indicate to debtors that there may be an arrearage and Ocwen maintains their lien rights notwithstanding the debtors' discharge. This is done more as a service to debtors with the intent of preventing foreclosure and not with the intent of harassment or violating any statutory injunctions." (Doc. No. 20, at pg. 2).

Second, Ocwen contends that it never received proper notice of the Debtors' bankruptcy since most, if not all, of the notices regarding the Debtors' status in bankruptcy were sent to the address Ocwen uses for the receipt of payments, whose location is in Los Angeles, instead of being sent to its address in Orlando which, among other things, processes bankruptcy matters. In support of this position, Ocwen submitted as evidence a copy from its web page which clearly set forth these different addresses.

■ From an initial standpoint, Ocwen's first argument completely ignores the lit-

erally hundreds of phone calls it initiated to the Debtors regarding the lack of payments on its debt. In this respect, it is simply inconceivable that Ocwen would make such a large number of calls, as it argues, simply as a "service" to the Debtors, or to otherwise preserve its lien rights. However, even setting aside the phone calls, Ocwen's first argument still lacks merit.

A review of the statements sent by Ocwen, whether the account statements, insurance correspondences or other matters, all state in no uncertain terms that Ocwen is attempting to collect a debt, and that the Debtors are liable for this debt. To just scratch the surface, one of the insurance letters sent by Ocwen states that "[a]t your expense, we have purchased insurance to protect" our interest. (Dr. Ex. 11). Equally notable, is the fact that a warning was set forth in those correspondences sent by Ocwen's legal representative; the contents of this warning specifically stated the purpose of the letters was to collect a debt, a statement which, under the Fair Debt Collection Practices Act, is required when an entity, other than the actual creditor, engages in debt collection activities. 15 U.S.C. § 1692e(11). Besides these examples, many additional indicators can be gleaned that the true nature of the correspondences sent to the Debtors, and as set forth in detail in this Court's findings of fact, were aimed at collecting on its debt, as opposed to merely being a "service" provided to the Debtors. For brevity's sake, however, the Court will not address each of these indicators in detail, but will instead end by simply positing these two questions: (1) how should a debtor interpret the receipt of account statements with ever increasing balances; and (2) how would a reasonable debtor interpret a letter sent from a law firm wherein it is stated that the law firm has been authorized by the creditor to take action regarding the past-due nature of the debtor's account?

In rebuttal, Ocwen brought to the Court's attention that many of the correspondences it sent to the Debtors made allowances for bankruptcy, with three of the letters specifically stating that the Debtors should ignore the correspondences if they had filed for bankruptcy relief. Taken thus to its logical end, it is Ocwen's position that a letter aimed at the collection of a debt will not violate the automatic stay so long as a provision in the letter also makes allowance for the fact that the debtor may be in bankruptcy. Although this may have some degree of truth in certain very limited circumstances,—by way of example, the Sixth Circuit Court of Appeals has held that sending a reaffirmation letter does not automatically violate the stay of § 362[1]—in this case the scope and breadth of Ocwen's correspondences are simply too great to be purged by a few simple disclaimers concerning the hypothetical existence of a bankruptcy proceeding. Thus, for all these reasons, it is simply inconceivable that those phone calls and correspondences initiated by Ocwen and its legal representative were, in the aggregate, anything but an attempt to collect on a prepetition debt owed by the Debtors. As a result, it is the holding of this Court that Ocwen's actions constituted a "willful" violation of the type of conduct prohibited in paragraph (6) of § 362.

■ Turning now to the Ocwen's second argument concerning improper notice, it is true that, for organizational reasons, most large financial institutions, such as Ocwen, utilize different addresses and departments—which sometimes, as is the

---

**1.** *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417, 424–25 (6th Cir.2000).

case here, are on different sides of the country—to handle different types of financial transactions. Based thereon, it is quite common for a debtor, as occurred here, to cause notice of his or her bankruptcy petition to be sent to an improper address within the corporation. When this does happen, delays with the corporate-creditor ceasing its collection activities often occur. While not preferable, this has become an accepted reality, and therefore, in some instances may in the very short term mitigate against the existence of a "willful" violation of the stay for purposes of § 362(h). *See Clayton v. King, et al. (In re Clayton),* 235 B.R. 801, 811–12 (Bankr.M.D.N.C.1998) (improper notice may mitigate damages).

■ Nevertheless, while an octopus may have eight legs, it is still the same octopus. As a result, bankruptcy law not only requires, but demands, that companies, whether large or small, have in place procedures to ensure that formal bankruptcy notices sent to an internally improper, but otherwise valid corporate address are forwarded in a prompt and timely manner to the correct person/department. As a consequence, Ocwen's defense that its collection efforts against the Debtors were merely the result of a flaw in its internal organizational structure—the argument that the right hand does not know what the left hand is doing—falls on deaf ears.

This rule has been universally followed by other bankruptcy courts, and is really just an extension of the principle that corporations are expected to have in place procedures to ensure that they comply with all areas of the law. By way of example, in *In re Withrow,* the bankruptcy court stated that a creditor's "election to operate through a complex system of distant agents must be responsible for consequences of breakdowns in that system. It cannot create a complex system likely to

produce stay violations and then assert the results of that complexity as a defense." 93 B.R. 436, 439 (Bankr.W.D.N.C.1988) (internal parentheses omitted). Also, in *Henry v. Assocs. Equity Home Servs. (In re Henry),* a case similar to this one in that notice was given to an improper department, it was noted that "the automatic stay does not recognize such compartmentalization of a creditor—notice to an entity is notice." 266 B.R. 457, 470 fn. 7 (Bankr. C.D.Cal.2001).

In addition, and although the following suppositions were not actually substantiated at the Hearing held in this matter, Ocwen's position regarding the lack of formal notice operating as a mitigating factor against the existence of any "willful" conduct is simply not cogent. To begin with, given Ocwen's status as a large financial institution, handling many consumer mortgage transactions, this cannot be the first time that notice of a bankruptcy petition was sent to the address utilized by Ocwen for the receipt of payments. Thus, unless Ocwen simply refuses, in all bankruptcy matters, to acknowledge notices sent to an improper address, it must have in place an internal procedure to handle such matters. In a like manner, this Court highly suspects that Ocwen, as with most other businesses who receive large sums of money from the general public, has in place an internal procedure to ensure that if a payment is sent to an improper department, receipt of that payment will still be timely forwarded to the proper address.

■ However, even setting all this aside, whether the Debtors sent notice of their bankruptcy to the correct address is actually a moot point. For purposes of § 362(h), bankruptcy law only requires that a party receive actual notice which is defined as the type of notice that would cause a reasonably prudent person to make a further inquiry; formal notice is

not required. *In re Flack*, 239 B.R. 155, 163–64 (Bankr.S.D.Ohio 1999); *Haile v. New York State Higher Educ. Servs. Corp.*, 90 B.R. 51, 55 (W.D.N.Y.1988). As it applies thereto, it cannot be disputed that Ocwen was imparted with actual notice of the Debtors' status in bankruptcy, but despite such knowledge continued its collection efforts. For starters, when Ocwen called the Debtors regarding its claim, it was repeatedly informed by the Debtors that they had filed for bankruptcy protection, giving the name and phone number of their attorney, Mr. Purcel, in the process. In addition, the Debtors' attorney, although not actually making any phone calls, sent numerous correspondences to Ocwen regarding Mr. and Mrs. Perviz's status as debtors in bankruptcy.

Therefore, in sum, despite having both formal and actual notice of the Debtors' bankruptcy petition, and thereafter having more than an ample amount of time to ensure compliance with the Bankruptcy Code, Ocwen simply continued with its collection activities as if the Debtors had never filed for bankruptcy. Thus, the overwhelming weight of the evidence leads to the conclusion that, within the meaning of paragraph (h), Ocwen willfully engaged in collection activities that are violative of the type of conduct proscribed in § 362(a)(6).

█ Even so, it is understood that damages are only recoverable under paragraph (h) of § 362 if, at the time the violation(s) occurred, the stay was actually in effect. For collection activities, such as those at issue here which are prohibited by § 362(a)(6), the stay terminates when the debtor is granted a discharge, an event which occurred in this case on December 6, 2002. 11 U.S.C. § 362(c)(2)(C).[2] As it concerns the Debtors' Motion for Violation of Stay, this raises an issue as to the applicability of the automatic stay, and the Debtors' entitlement to damages thereunder.

To begin with, the evidence presented to the Court shows that all of Ocwen's correspondences, together with almost all of Mr. Purcel's legal work related to Ocwen's collection activities occurred after the Debtors received their discharge. Furthermore, while the Court finds it credible that the Debtors received hundreds of phone calls from Ocwen,—in particular, it is noted that Mrs. Perviz could recall some of the names of the individual callers—the testimony regarding the timing of these calls was vague as to what portion of the calls occurred postpetition, but predischarge. In this regard, while a journal would have been helpful, the testimony elicited from the Debtors, and especially Mrs. Perviz, highly suggests that the vast majority of the phone calls made by Ocwen occurred postdischarge. Of particular importance, the Debtors only first contacted Mr. Purcel concerning Ocwen's phone calls on December 5, 2002, just one day before the Debtors were granted a discharge in their bankruptcy case. Accordingly, while Ocwen's collection activities certainly constituted a "willful" violation of the type of conduct proscribed in § 362(a)(6), the Court does not have before it sufficient evidence to make a determination as to the extent such actions, if any, occurred while

---

**2.** (c) Except as provided in subsections (d), (e), and (f) of this section-

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and

(2) the stay of any other act under subsection (a) of this section continues until the earliest of-

(C) if the case is a case under chapter 7 of this title concerning an individual ... the time a discharge is granted or denied.

the stay was in effect so as to be compensable under paragraph (h) of § 362.

 This, however, does not mean that the Debtors are without a remedy; actions by a creditor to collect on a debt after the entry of a bankruptcy discharge are similarly prohibited by the bankruptcy discharge as set forth in 11 U.S.C. § 524(a). Ocwen, however, at the hearing held in this matter, objected to the consideration of this statutory provision on account of the Debtors' failure to raise the matter in their Motion for Violation of Stay. Nevertheless, while recognizing this deficiency in the Debtors' Motion, Ocwen's objection must be overruled because, as will be explained, the evidence necessary to support a claim for damages is for all practical purposes the same regardless of whether the violation occurs before or after the bankruptcy discharge is entered. Thus, Ocwen, having had a fair opportunity to defend itself for a violation of the stay, will in no way be prejudiced by this Court addressing whether a violation of the discharge injunction occurred, and if there exists such a violation, whether the Debtors are entitled to damages. *See generally* FED.R.BANKR.P.7015(b) (issues not originally raised, if tried by implied consent of the parties, shall be treated as if they had originally been raised).

Section 727(a) provides that, unless certain specified conditions exists, a bankruptcy court "shall grant the debtor a discharge[.]" In order to bring effect to this section, § 524 of the Bankruptcy Code puts into place an injunction at the time the order of discharge is entered. Among other things, paragraph (2) of § 524(a),

like paragraph (6) of § 362(a), enjoins a creditor from undertaking any act to collect or recover on any debt that arose before the commencement of the bankruptcy case. Although from a substantive standpoint, there are some minor differences in both the scope and language of § 524(a)(2) and § 362(a)(6),—for example, the discharge injunction only prohibits the collection of a debt as a personal liability of the debtor—these two provisions are really just different sides of the same coin. As pointed out by the bankruptcy court in *In re Hessinger & Associates,* § 524(a)(2) simply makes permanent what had previously been temporary under § 362(a)(6). 165 B.R. 657, 659 (Bankr.N.D.Cal.1994).[3]

 However, unlike § 362 which, pursuant to paragraph (h), specifically authorizes, and in fact demands that a debtor be awarded damages when a creditor engages in a "willful" violation of the stay, no comparable provision is set forth in § 524. In *Pertuso v. Ford Motor Credit Co.,* a case in which the debtors sought to maintain a class action suit for a violation of § 524, the Sixth Circuit Court of Appeals found this omission significant, stating:

> Congress amended the Bankruptcy Code in 1984 to provide an express right of action under the automatic stay provision of 11 U.S.C. § 362(h). It did so because reliance on the contempt power to remedy violations of § 362 had been widely criticized. Congress amended § 524 at the same time it amended § 362, but no private right of action was added in § 524. The contrast, we think, is instructive.

---

**3.** *See Paglia v. Sky Bank (In re Paglia),* 302 B.R. 162, 169, 2003 WL 22359516 *6 (Bankr. W.D.Pa.2003) ("an 'act to collect' for purposes of § 524(a)(2) applies *pari passu* with respect to the same phrase for purposes of § 362(a)(6)."); *Jamo v. Katahdin Federal Credit Union (In re Jamo),* 253 B.R. 115, fn.

11 (Bankr.D.Me.2000) ("the statutory language of § 362(a)(6) and § 524(a)(2) is parallel and must be read to indicate that Congress meant to forbid the same acts."), *aff'd,* 262 B.R. 159 (1st Cir. BAP 2001), *rev'd on other grounds,* 283 F.3d 392 (1st Cir.2002).

233 F.3d 417, 422 (6th Cir.2000) (internal citation omitted). Based thereon, the Sixth Circuit held that it would join those courts "that have held § 524 does not impliedly create a private right of action." *Id.* at 422–23. Thus, the rule in the Sixth Circuit is that a debtor injured by a violation of the discharge injunction has no right to statutory damages. Instead, when a violation of the discharge injunction does occur, a debtor's sole avenue of recourse— and the one for which is the traditional remedy for a violation of a court order—is to bring an action against the creditor for contempt. *Id.* at 421.

■ Bankruptcy courts have both an inherent and, as set forth in § 105(a), the statutory power to hold parties in contempt. *Id.* at 423, fn. 1; *In re Harris*, 297 B.R. 61, 69 (Bankr.N.D.Miss.2003). When a violation of the discharge injunction of § 524(a) is at issue, a finding of contempt is appropriate when, under the identical standard as set forth in § 362(h), the creditor's actions are found to be "willful." *In re Pincombe*, 256 B.R. 774, 782–83 (Bankr. N.D.Ill.2000). Couched in the language of § 524, a "willful" violation of the discharge injunction takes place "if the creditor knew the discharge injunction was invoked and intended the actions which violated the discharge injunction." *Poole v. U.B. Vehicle Leasing, Inc. (In re Poole)*, 242 B.R. 104, 110 (Bankr.N.D.Ga.1999).

■ Based therefore upon the foregoing analysis of § 524(a), two related legal conclusions logically follow. First, having found that Ocwen's collection activities were violative of the type of acts proscribed by § 362(a)(6), such activities, having occurred postdischarge, similarly give rise to a violation of the discharge injunc-

tion as set forth in § 524(a)(2). *See Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir.2000) (holding that it could not see how conduct not violative of § 362 could violate § 524). Similarly, since Ocwen's postdischarge collection activities were also found to be "willful" within the meaning of § 362(h), Ocwen is in contempt for violating the discharge injunction of § 524(a).

■ A creditor found in contempt of violating the discharge injunction, is, in the court's discretion, subject to sanctions.[4] *Arruda v. Sears, Roebuck & Co.*, 273 B.R. 332, 345 (D.R.I.2002). Although a variety of sanctions are available,—e.g., a fine paid into the court—most bankruptcy courts, when faced with a willful violation of the discharge injunction, allow the debtor an award of actual damages plus attorney fees. *See In re Goodfellow*, 298 B.R. 358 (Bankr.N.D.Iowa 2003); *Walker v. M & M Dodge, Inc. (In re Walker)*, 180 B.R. 834 (Bankr.W.D.La.1995). In *Miller v. Chateau Communities, Inc. (In re Miller)*, the Sixth Circuit Court of Appeals specifically upheld this type of an award in a situation where the discharge injunction was violated on account of a lessor's repeated attempts to collect postpetition rent. 282 F.3d 874, 875 (6th Cir.2002). In like fashion, this Court has traditionally awarded actual damages plus attorney fees to a debtor injured by a willful violation of the discharge injunction. *Mayer v. Huntington Nat'l Bank (In re Mayer)*, 254 B.R. 396, 397–98 (Bankr.N.D.Ohio 2000). In this particular case, the Court can see no reason to deviate from this practice given the broad scope of Ocwen's postdischarge collection activities against the Debtors.

4. In reality, this means that the only meaningful difference between awarding damages under paragraph (h) of the automatic stay provision, as opposed to awarding damages for contempt under § 524(a) is that the former is mandatory, while that latter is discretionary. *Henry v. Ass'c Home Equity Serv. (In re Henry)*, 266 B.R. 457 (Bankr.C.D.Cal.2001).

■ Turning now to the particulars of this case, this Court has no difficulty in approving the $2,555.00 in attorney fees and expenses asked for by Mr. Purcel. To begin with, the billing statement submitted by Mr. Purcel was clearly limited to the following three categories of legal activities, all of which were undoubtably related to Ocwen's postpetition collection efforts: (1) conferences with the Debtors both over the phone and in person regarding Ocwen's collection activities; (2) preparing letters to Ocwen demanding that they cease their collection activities; and (3) preparing the instant motion and matters related thereto. Also, when set against the scope of Ocwen's collection activities, the 14.6 hours Mr. Purcel spent to fully perform such service does not seem out of line. Finally, Mr. Purcel's billing rate of $175.00 per hour is generally in conformance with the hourly rate charged by other bankruptcy attorneys in this area.

Addressing now the question of actual damages, the Debtors contend, and especially in the case of Mrs. Perviz, that Ocwen's collection activities caused them significant mental and emotional distress for which they should be entitled to receive damages. In support thereof, Mrs. Perviz testified that, on account of Ocwen's collection activities, she was prescribed with a nerve medication. It is, however, Ocwen's position that neither of the Debtors actually suffered from any significant mental and/or emotional stress; and even if they did, they did not incur any actual damages, or at the very most, their actual damages were minimal. By way of example, Ocwen was able to establish, on cross-examination, that the medication prescribed to Mrs. Perviz was almost completely covered by her employer-maintained health insurance. Moreover, Ocwen established that, as a result of its collection activities, the Debtors did not experience any other actual out-of-pocket expenses, or some other type of diminution in assets.

■ However, contrary to Ocwen's position, when a "willful" violation of the discharge injunction is at issue, damages for mental/emotional distress may be awarded, despite the absence of any demonstrable out-of-pocket losses, if two conditions are met: (1) the debtor clearly suffered some appreciable emotional/mental harm; and (2) the actions giving rise to the emotional/mental distress were severe in nature. *Bishop v. U.S.Bank/Firstar Bank, N.A., (In re Bishop),* 296 B.R. 890, 897 (Bankr.S.D.Ga.2003); *Aiello v. Providian Fin. Corp.,* 257 B.R. 245, 249 (N.D.Ill. 2000); *Atkins v. U.S.A. (In re Atkins),* 279 B.R. 639, 644 (Bankr.N.D.N.Y.2002); *In re Poole,* 242 B.R. at 112. As it concerns the former requirement, actual medical testimony is helpful, but not always needed. *Id.* In this regard, the greater the extent of the creditor's violation, the less corroborating evidence, including medical testimony, that will be needed to establish that the debtor suffered from an appreciable amount of emotional/mental distress so as to be compensable. The converse is also true, and thus the less severe the creditor's conduct, the more important corroborating evidence will become, particularly medical testimony, to sustain a case for compensatory damages based upon emotional/mental distress. *In re Atkins,* 279 B.R. at 644.

In looking at the circumstances as they exist in this case, the facts show that over a significant period of time Ocwen made literally hundreds of phone calls to the Debtors, sometime calling up to eight times in a single day. These phone calls, in addition to greatly disturbing the tranquility of the Debtors' household, caused Mrs. Perviz, on many occasions, to be deprived of sleep which, in turn, had an adverse effect on her work. In this re-

gard, Mrs. Perviz repeatedly stated in her testimony that she just wanted the phone calls to stop so that her household would no longer be disturbed.

In this Court's view, given the large volume of calls made by Ocwen to collect on its debt, any reasonable person would have suffered from an appreciable amount of emotional/mental distress. *See In re Miller*, 200 B.R. 415, 417 (Bankr.M.D.Fla. 1996) (numerous phone calls will support award of damages). As a result, based upon Ocwen's phone calls, alone, the Court believes that the Debtors have made out a sufficient basis to warrant an award of compensatory damages for emotional/mental distress. However, even assuming, *arguendo*, that this was not the case, any doubts as to the Debtors' entitlement to compensatory damages are dispelled by those correspondences sent to the Debtors, the contents of which would have also caused any reasonable person a significant amount of distress. For example, those letters informing the Debtors that they were liable for the payment of insurance on a house that they had both abandoned in bankruptcy and then physically vacated, would undoubtably have been met with some degree of consternation by a similarly situated debtor. Additionally, like the phone calls, the severity of such stress is clearly compounded by the sheer number of correspondences sent by Ocwen, which, as discussed earlier, were clearly aimed at collecting on a prepetition debt.

Thus, in weighing the severity of the above acts, together with the Debtors' testimony relating to the significant emotional/mental distress they incurred as a result of Ocwen's collection activities, the Court finds that a proper assessment of damages for emotional/mental distress is $2,000.00. Having made this award of actual damages, one final issue needs to be addressed: Are the Debtors entitled to an award of punitive damages?

■ Unlike compensatory damages, punitive damages serve the same purpose as criminal penalties: to punish a party for their wrongful conduct and to deter further conduct of that same nature. *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307 fn. 9, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249. In situations where this policy function would be furthered, most court decisions have held, and this Court subscribes to the legal tenet that bankruptcy courts have the inherent power to punish parties for their contemptuous violation of the discharge injunction through the imposition of punitive damages. *In re Latanowich*, 207 B.R. 326 (Bankr.D.Mass.1997); *Walker v. M & M Dodge, Inc. (In re Walker)*, 180 B.R. 834 (Bankr.W.D.La.1995). The reasoning behind this was well explained in *In re Walker*: "this Court does not believe that Congress would enact § 524 and not empower bankruptcy courts to dissuade invidious creditors from conduct violative of a clear congressional prohibition. To do so would be nothing more than an exercise in legislative futility." *Id.* at 849.

■ However, as in any case, punitive damages are only appropriate where there is some sort of nefarious or otherwise malevolent conduct. *Stachura*, 477 U.S. at 307 fn. 9, 106 S.Ct. 2537. Thus, in situations involving a violation of the discharge injunction, punitive damages have been properly limited to circumstances where there exists a complete and utter disrespect for the bankruptcy laws. *In re Arnold*, 206 B.R. 560, 568 (Bankr.N.D.Ala. 1997) (punitive damages warranted where creditor acted willfully and maliciously in clear disregard and disrespect of the bankruptcy laws); *cf In re Borowski*, 216 B.R. 922, 925 (Bankr.E.D.Mich.1998) (where parties appeared to have been acting more

out of ignorance than clear disregard and disrespect of bankruptcy laws, requisite malevolent intent to award punitive damages was lacking.) In line therewith, this Court has always exercised great restraint in awarding punitive damages. Even so, if ever there was a case calling for the imposition of punitive damages, this is it.

Earlier, and in some detail, the Court has already discussed the harassing nature of the literally hundreds of phone calls and numerous letters Ocwen sent to the Debtors regarding its debt. Moreover, the Court already discounted Ocwen's two overall justifications for such actions: (1) its contacts with the Debtors were meant solely for informational purposes; and (2) notices of the Debtors' bankruptcy petition and subsequent correspondences were sent to the improper corporate address. Thus, in light of the broad scope of its collection activities, Ocwen's conduct cannot be seen as anything but a total disrespect for the bankruptcy system, thereby warranting the imposition of punitive damages.

However, what makes this case especially egregious is that Ocwen's collection efforts, instead of lessening with the passage of time, became more and more aggressive as time progressed. In fact, in the beginning, those collection efforts undertaken by Ocwen, although they cannot be condoned, seem to have been relatively mild. In addition, it appears that Ocwen, at the time of the Debtors' bankruptcy filing, initially complied with the stay imposed by § 362(a). However, once the Debtors received their discharge, Ocwen's collection efforts began to increase in intensity. For example, after the entry of the discharge and the Debtors' vacation of their home, Ocwen took almost no time in locating the Debtors at their new place of residence.

Ocwen's collection efforts also seem to have increased with intensity the more Mr. Purcel made an effort to have such activities stopped. In this regard, the facts show that most of the correspondences sent by Ocwen occurred from April to July of 2003, while Mr. Purcel sent letters to Ocwen regarding the illegal nature of their collection activities during this same period of time: respectively, May 1, June 10, and July 24, of 2003. Particularly troubling, is that even after Mr. Purcel brought the instant action to have Ocwen stop its collection efforts, Ocwen continued to make both phone calls and send correspondences to the Debtors. In fact, the last contact between Ocwen and the Debtors seems to have taken place on September 9, 2003, three months after the instant motion was filed and just a little over one month before the instant hearing was held.

Thus, based upon these facts, this is not simply a case of a creditor who chose to ignore the discharge injunction. Rather, Ocwen's actions are demonstrative of a creditor who consciously decided that it, unlike other creditors, was not subject to the discharge injunction. Moreover, this is not the case of a small unsophisticated creditor whose knowledge of the bankruptcy process is limited; instead, Ocwen has available at its disposable the means to fully know the law, and the ability to ensure compliance therewith. Under such circumstances, the imposition of punitive damages is absolutely necessary to preserve the integrity of the bankruptcy system. As observed in *In re Latanowich*, when addressing an award of punitive damages for a violation of § 524:

> consequential damages do little more than dispossess the contemnor of its ill-gotten gains, which leaves it in no worse a position than if it had not violated the law at all. This gives [the creditor] no incentive to discontinue its unlawful practice. In the form of punitive damages, the Court will supply this incentive by making it significantly more costly

for [the creditor] to do business by illegal methods than by legal ones.

207 B.R. 326, 338 (Bankr.D.Mass.1997).

At the same time, the Supreme Court of the United States has held that punitive damages are subject to the due process clause of the United States Constitution, and thus may not be imposed with impunity; in establishing a limitation on punitive damage awards, the Supreme Court set forth three guideposts: (1) the degree of reprehensibility of the defendants misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996).

In taking all the above considerations into account, the Court is of the Opinion that the Debtors are entitled to an award of $8,000.00 in punitive damages; an amount which, given the representability of the Ocwen's conduct, sufficiently punishes, but is not out of line with awards made by other courts.[5] In making this award, however, the Court also gives this warning: If Ocwen should appear on a matter that, like in this case, involves a complete and utter disrespect for the automatic stay and/or the discharge injunction, this Court will not hesitate to impose punitive damages in ever increasing amounts until Ocwen feels it necessary to comply with the bankruptcy laws as promulgated by the Congress of the United States.

One final note for the record. This Court's decision should not be taken to reflect negatively on attorney Mark Bredow's handling of this case. In this Court's view, Mr. Bredow handled this case in a very competent and professional manner. The facts as they exist in this matter, however, were simply too egregious to have been presented in a positive light.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that Ocwen Federal Bank, FSB, is hereby adjudged to be in Civil Contempt for violating this Court's order of discharge, dated December 6, 2002, and the discharge injunction as set forth under 11 U.S.C. § 524(a).

It is **FURTHER ORDERED** that as a sanction for its contempt, the Debtors, Osman and Sanela Perviz, shall collectively be entitled to a judgment in the amount of Ten Thousand dollars ($10,000.00), of which Two Thousand dollars ($2,000.00) represents actual damages and Eight Thousand dollars ($8,000.00) is for punitive damages.

It is **FURTHER ORDERED** that as a sanction for its contempt, Jerry Purcel, attorney for the Debtors, shall be entitled to a judgment for his fees and expenses in the amount of Two Thousand Five Hundred Fifty-five dollars ($2,555.00).

---

5. *In re Shade,* 261 B.R. 213 (Bankr.C.D.Ill. 2001) (awarding $9,000.00 in punitive damages); *McCormack v. Federal Home Loan Mortgage Corp. (In re McCormack),* 203 B.R. 521 (Bankr.D.N.H.1996) (punitive damages award of $10,000.00); *Varela v. Ocasio (In re Ocasio),* 272 B.R. 815, 825 (1st Cir. BAP 2002) (upholding award of $9,000.00 in punitive damages); *In re Baker,* 140 B.R. 88 (D.Vt. 1992) (upholding award of $10,000.00 in punitive damages); *In re Bishop,* 296 B.R. 890 (Bankr.S.D.Ga.2003) (imposing punitive damage award of $50,000.00).

It is **FURTHER ORDERED** that the Clerk, United States Bankruptcy Court, enter monetary judgments in accordance with the above orders.