**In re Eugene Roy NIBBELINK and Luise T. Nibbelink, Debtors.**

**Eugene Roy Nibbelink and Luise T. Nibbelink, Plaintiffs,**

**v.**

**Wells Fargo Bank, N.A. successor by merger to Wells Fargo Home Mortgage, Inc., Defendant.**

**Bankruptcy No. 03–507–PMG. Adversary No. 07–207.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Feb. 11, 2009.

Lansing J. Roy, Attorney for Plaintiffs.

Peggy Ballweg, Attorney for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This proceeding came before the Court for a trial on September 3, 2008 on damages for violation of the discharge injunction by Wells Fargo Bank, N.A. ("Wells Fargo"). In lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

On January 17, 2003 Plaintiffs filed a voluntary petition under Chapter 13 of the Bankruptcy Code. (Doc. 1.) Plaintiffs' mortgage with Wells Fargo, successor by merger to Wells Fargo Home Mortgage, Inc. was current through January 2003 and there was no pre-petition arrearage to be dealt with under the Chapter 13 plan. On June 18, 2003 Plaintiffs filed First Amended Chapter 13 Plan (the "Plan"). (Doc. 19.) The Plan provided for Wells Fargo to be paid $818.00 per month for thirty-six months. Paragraph 6 of the Plan contained the following language:

> Late fees or Attorneys Fees: No creditor shall be entitled to any late fees, attorney's fees, or interest other than the interest contained in the payments provided for by the plan during the bankruptcy, including the life of this

plan. Upon successful completion of this plan, the [Plaintiffs]' mortgage balance shall be deemed current as a matter of law.

On September 19, 2003 the Court entered an order confirming the Plan. (Doc. 24.) Plaintiffs made all of their Chapter 13 payments timely. On April 10, 2006 a discharge was entered. (Doc. 31.)

The Trustee sent the last payment being paid through the Plan to Wells Fargo on February 2, 2006. That payment was in the amount of $1,397.14 and was received by Wells Fargo on February 8, 2006. The February 8, 2006 monthly statement from Wells Fargo to Plaintiffs reflected receipt of the payment. (Pls.' Ex. 10.) The funds were applied as follows: $139.76 to principal; $528.34 to interest: $203.45 to escrow; and $525.59 to unapplied. In addition, the statement claimed $3,486.20 in overdue payments and $298.00 in late charges.

The first post-plan payment to be made directly by Plaintiffs to Wells Fargo was the February, 2006 payment. Plaintiffs commenced making monthly mortgage payments directly to Wells Fargo on February 24, 2006 and paid those payments in a timely fashion until they sold their home on January 22, 2007 and paid off the mortgage held by Wells Fargo. The HUD–1 Settlement Statement reflects that Wells Fargo was paid $92,233.80 upon the sale of the property. (Pls.' Ex. 5.) At no time between February 2006 and January 22, 2007 did Plaintiffs and Wells Fargo reach an agreement as to Wells Fargo's assertion that Plaintiffs owed it $3,486.20 in overdue payments and $298.00 in late charges.

Wells Fargo made numerous telephone calls and sent numerous letters to Plaintiffs after the Chapter 13 discharge demanding that Plaintiffs become current or Wells Fargo would foreclose. On August 14, 2006 Plaintiffs' counsel sent a qualified written request to Wells Fargo asking Wells Fargo to provide an accounting so that the matter could be resolved. (Pls.' Ex. 18.) Along with the letter, Plaintiffs' counsel sent copies of the following documents: a notice of Plaintiffs' Chapter 13 case; the Order Confirming Chapter 13 Plan; the discharge of [Plaintiffs]; the Chapter 13 Trustee printout showing the payment history to Wells Fargo's predecessor in interest; and a docket of the Chapter 13 case. Wells Fargo did not respond to the qualified written request.

On September 6, 2006 Wells Fargo sent Plaintiffs a letter with large bold capital type which read "YOUR MORTGAGE IS IN SERIOUS DEFAULT PREVENT FORECLOSURE ACTION" and informing them that their failure to take action would lead Wells Fargo to believe that Plaintiffs were "indifferent" to the problem. (Pls.' Ex. 19.) On September 11, 2006 Wells Fargo sent Plaintiffs a letter informing them that the loan was in default and that their failure to pay the delinquency would result in acceleration of the mortgage and a possible foreclosure. (Pls.' Ex. 20.) On October 3, 2006 Plaintiffs' counsel sent a follow up letter to the qualified written request indicating that if Wells Fargo failed to make corrections to the account or provide an explanation as to why it believed the accounting was correct, Plaintiffs would file a complaint against Wells Fargo. (Pls.' Ex. 21.) Accompanying the second letter was a certified mail receipt card showing that Wells Fargo signed for the qualified written request on August 18, 2006. Wells Fargo did not respond to the follow up letter.

A review of Wells Fargo's Customer Account Activity Statement shows at least $2,261.55 in property preservation fees, investor repayment charges, miscellaneous foreclosure and bankruptcy and statutory expenses which had been posted during

the Chapter 13 plan. (Pls.' Exs. 3, 11.) These expenses were never presented to the Court for approval. The payoff statement dated December 29, 2006 from Wells Fargo included $2,684.32 for unpaid interest and late charges. (Pls.' Ex. 4.) As a result of Well Fargo's default in this proceeding, the Court prohibited Wells Fargo from attempting to explain whether this amount was proper or how it was calculated.

The principal balance on the December 29, 2006 payoff statement was $88,840.36. (Pls.' Ex. 4.) Between February 2006 and December 2006 Wells Fargo sent Plaintiffs at least five statements or letters (including several to which the Court already referred), each with varying past due amounts. Additionally, Plaintiffs' May 2006 and July 2006 credit reports reflect varying amounts owed. (Pls.' Exs. 14, 16.) Because of the unreliability and inaccuracy of the statements and credit reports, the Court finds that the principal balance of $88,840.36 shown in the December 29, 2006 payoff letter should be subtracted from the $92,223.80 payoff figure from the HUD–1. The Court finds that Plaintiffs were overcharged $3,383.44 at closing.

Mr. Nibbelink testified that during the summer of 2006, he began considering refinancing his home. After being rejected for refinancing, Mr. Nibbelink obtained a copy of his credit report only to discover that Wells Fargo had reported that Plaintiffs were ninety days late on their mortgage.[1] Mr. Nibbelink testified that his inability to refinance his home and to ob-

tain the equity therein left him in despair. Mr. Nibbelink testified that his despair at being unable to access the equity in his home was compounded by the fact that he was unable to financially assist his three sons, who were dealing with various marital, emotional, and legal problems. Mr. Nibbelink also testified that his inability to refinance his home in order to obtain money to pay for relocation expenses prohibited him from accepting a job offer.

Bonnie DeRitter, a mortgage broker in the Jacksonville area, testified on Plaintiffs' behalf. During 2005 and 2006 Ms. DeRitter refinanced twenty-five mortgages for individuals who were in or had been in Chapter 13. Ms. DeRitter testified that in light of their perfect payment history on their home, the Chapter 13 discharge, the absence of debt other than a mortgage, and the amount of equity in their home, Plaintiffs would have had a 99.9% certainty of refinancing their home were it not for Wells Fargo's improper reporting to the credit bureaus.

Because they were unable to refinance their home, Plaintiffs decided to sell it. In October 2006 while working on the house to prepare it for sale, Mr. Nibbelink suffered a heart attack. He began taking sleeping pills every night so he could go to work the next day. Although Mr. Nibbelink, a school teacher, feared he would have another heart attack in front of his students, he was required to return to work because he had exhausted his leave.

Mrs. Nibbelink testified that as a result of Wells Fargo's post-discharge collection

---

1. Plaintiffs' May 16, 2006 Experian credit report shows that Plaintiffs were 90 days late as of December 2005 to February 2006; 60 days late as of May 2006, November 2005, October 2005, August 2005, June 2005, April 2005, and March 2005; 30 days late as of April 2006, March 2006, September 2005, July 2005 and May 2005. (Pls.' Ex. 14.) Plaintiffs' July 12, 2006 Experian credit report shows that Plaintiffs were 90 days late as of December 2005 to February 2006; 60 days late as of July 2006, May 2006, November 2005, October 2005, August 2005, June 2005, April 2005, and March 2005; and 30 days late as of June 2006, April 2006, March 2006, September 2005, July 2005 and May 2005. (Pls.' Ex. 16.) The Court finds that these payments were current.

efforts the following events occurred. She became anxious, scared, suicidal, and felt belittled and worthless. She could not eat and could not function. Her inability to help her children caused her to become depressed. Witnessing her husband's reaction to the post discharge events and observing that her husband became withdrawn, distant, angry, and bitter led her to begin drinking heavily.

Plaintiffs filed this adversary proceeding on August 17, 2007. On October 4, 2007 the Court entered a default as a result of Wells Fargo's failure to file an answer. On October 17, 2007 Wells Fargo filed a motion to vacate the default, alleging that its failure to file an answer was the result of excusable neglect. After a hearing on November 27, 2007 the Court on January 24, 2008 entered an order denying the motion to vacate the default, finding that Wells Fargo failed to prove excusable neglect.

For the next five months Plaintiffs took no action to prosecute this adversary proceeding. On May 23, 2008 the Court entered Notice of Intent to Dismiss for Want of Prosecution. On June 20, 2008 Plaintiffs filed Objection to the Notice of Intent to Dismiss for Want of Prosecution as well as a Motion for Default Judgment, a Memorandum of Law in support of Motion for Default Judgment and proposed findings of fact and conclusions of law. Plaintiffs sought the following: 1) damages for overcharges to their account; 2) damages for mental and emotional distress; 3) punitive damages; 4) attorney's fees; 5) the removal by Wells Fargo of all adverse entries related to Wells Fargo from Plaintiffs' credit bureau reports; and 6) the imposition of a fine of $100.00 per day from April 11, 2006 until the payment in full of all sanctions approved by the Court.

By order dated July 17, 2008 the Court found that, accepting the allegations contained in the complaint as true, Wells Fargo's actions violated the discharge injunction and that Plaintiffs were entitled to damages for the overcharges to their mortgage account, attorney's fees, and the removal by Wells Fargo of all adverse entries related to Wells Fargo from Plaintiffs' credit bureau reports. The Court scheduled an evidentiary hearing for September 3, 2008 on Plaintiffs' request for punitive damages, damages for mental and emotional distress, and the imposition of a $100.00 daily fine from April 11, 2006 until payment in full of all sanctions.

### Conclusions of Law

■ Section 524 of the Bankruptcy Code operates as a post-discharge injunction against the collection of debts discharged in bankruptcy and is thus the embodiment of the Code's fresh start concept. *Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1388–1389 (11th Cir. 1996). Section 524 provides in relevant part:

(a) A discharge in a case under this title-(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; 11 U.S.C. § 524 (West 2007).

■ Although § 524 does not explicitly authorize monetary damages for a violation of the discharge injunction, a court may award actual damages pursuant to the statutory contempt powers set forth in 11

U.S.C. § 105. *Hardy*, 97 F.3d at 1389–1390. In addition to the statutory contempt powers set forth in § 105, all courts have inherent contempt powers. *Jove Eng'g., Inc. v. Internal Revenue Service (In re Jove Eng'g., Inc.)*, 92 F.3d 1539, 1543 (11th Cir.1996)[2]. However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

In *Hardy* the Eleventh Circuit exercised the caution urged by the Court in *Chambers*. *Hardy* involved a contempt complaint requesting sanctions pursuant to § 105 against the Internal Revenue Service for violation of § 524's discharge injunction. The Court noted: "Instead of grounding liability for violation of the permanent stay in the court's inherent contempt powers and § 524, we exercise the caution recommended by the Court in *Chambers* and rely on the other available avenue for relief, statutory contempt powers under § 105." *Id.* at 1389. The Court will exercise similar caution and rely on its statutory contempt powers under § 105 rather than its inherent contempt powers to deal with this proceeding.

■ A [creditor] may be liable for contempt under § 105 if it willfully violates § 524's permanent injunction. *Hardy*, 97 F.3d at 1390. A creditor's conduct in violating the discharge injunction is willful if the creditor: 1) knew that the discharge injunction was invoked; and 2) intended the actions, which violated the discharge injunction. *Id.* The Court finds that Wells Fargo knew the discharge injunction was invoked and intended the actions which violated the discharge injunction. The Court turns to the issue of damages.

### Damages for Emotional Distress for Violation of Discharge Injunction

■ Neither the Eleventh Circuit nor any of the other Circuit Courts has addressed the issue of whether § 105 authorizes a bankruptcy court to award damages for emotional distress for a violation of the discharge injunction. However, a number of bankruptcy courts have awarded such damages. *In re Meyers*, 344 B.R. 61, 67–68 (Bankr.E.D.Pa.2006); *In re Feldmeier*, 335 B.R. 807, 812–815 (Bankr.D.Or.2005); *In re Gervin*, 337 B.R. 854, 863–64 (Bankr. W.D.Tex.2005) rev'd on other grounds, 2008 WL 4963209 (5th Cir. November 21, 2008); *In re Perviz*, 302 B.R. 357, 371 (Bankr.N.D.Ohio 2003); *In re Torres*, 2001 WL 1807624 (Bankr.D.P.R. October 17, 2001)(awarding emotional distress damages against Internal Revenue Service), aff'd, 309 B.R. 643, 649, 650 (1st Cir. BAP2004), rev'd, 432 F.3d 20, 31 (1st Cir. 2005) (holding that sovereign immunity bars award of emotional distress damages against federal government under § 105 for willful violation of § 524). This Court has previously held that in order to sustain a recovery of actual damages resulting from a violation of the automatic stay a debtor must prove that his emotional distress is more than fleeting, inconsequential, and medically insignificant. *In re Hedetneimi*, 297 B.R. 837, 842 (Bankr. M.D.Fla.2003). In the absence of conduct of such an egregious or extreme nature that emotional distress would be expected to occur, a debtor must present some medical or other corroborating evidence showing they suffered more than fleeting and inconsequential distress, embarrassment, humiliation, and annoyance. *Id.* The

---

**2.** The imposition of sanctions pursuant to a court's inherent contempt powers requires a showing that the contemnor acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1575 (11th Cir.1995).

Court believes this to be an appropriate standard for emotional distress damages for a violation of the discharge injunction. In addition to the above requirement, although it goes without saying, a debtor must demonstrate a causal connection between the emotional distress and the creditor's violation of the discharge injunction.

■ Plaintiffs argue that Wells Fargo's post discharge collection efforts resulted in their inability to refinance their home and the resulting multitude of problems to which they testified. Wells Fargo asserts that Plaintiffs' problems with their children would have caused emotional distress in their own right or at least increased the severity of any emotional distress caused by Wells Fargo's actions. Moreover, Wells Fargo asserts that in the absence of evidence regarding Mr. Nibbelink's health prior to the heart attack, Plaintiffs failed to prove that Wells Fargo's actions were the cause of Mr. Nibbelink's heart attack.

Upon the record before it, the Court finds that Plaintiffs did suffer significant emotional distress. The Court recognizes the self-serving nature of Plaintiffs' testimony, but finds it to be credible. However, while the Court finds that Wells Fargo's post-discharge collection efforts may have contributed in part to Plaintiffs' emotional distress, the Court agrees with Wells Fargo's assertion that Plaintiffs' emotional distress was caused in large part by Plaintiffs' problems with their children and that Wells Fargo's actions at most exacerbated an already bad situation. The Court finds that Plaintiffs failed to demonstrate the necessary causal connection between Wells Fargo's actions and their emotional distress. Accordingly, the Court finds in inappropriate to award Plaintiffs damages for emotional distress.

### Punitive Damages

■ In *In re Riser*, 298 B.R. 469 (Bankr.M.D.Fla.2003) this Court held that pursuant to its statutory contempt powers under § 105, it was without authority to impose punitive damages for a violation of the discharge injunction. *Id.* at 474 (*citing Hardy*, 97 F.3d at 1390). Upon further review of the Hardy decision, the Court finds that it read the decision too broadly. *Hardy* was not a blanket repudiation of punitive damages for a violation of the discharge injunction, but instead was limited to a rejection of punitive damages in the context of a waiver of sovereign immunity. *See In re McTyeire*, 357 B.R. 898, 904 (Bankr.M.D.Ga.2006) (noting that *Hardy's* proscription of the imposition of punitive damages was based on United States' violation of the discharge injunction and applied only because Congress' waiver of government's sovereign immunity did not extend to punitive damages); *In re Arnold*, 206 B.R. 560, 568 (Bankr.N.D.Ala. 1997) (noting that *Hardy's* limitation of "coercive and not punitive" sanctions was guided by § 106's sovereign immunity waiver). Accordingly, the Court holds that its statutory contempt powers under § 105 grant it the authority to impose punitive damages for a violation of the discharge injunction.

■ Courts have set forth several standards for the imposition of punitive damages for violation of the discharge injunction. *See In re Dynamic Tours & Transportation, Inc.*, 359 B.R. 336, 344 (Bankr.M.D.Fla.2006). Some courts assess punitive damages when a creditor has actual knowledge of a violation or with reckless disregard of the protected right. *Id.* (citations omitted). Another group of courts assesses punitive damages upon a showing of maliciousness or bad faith. *Id.* (citations omitted). Other courts assess punitive damages upon a demonstration of "an arrogant defiance of federal law." *Id.* (citations omitted). This Court has previously held that the imposition of punitive

damages for violation of the automatic stay is appropriate when the violator acts in an egregious, intentional manner. *Hedetneimi*, 297 B.R. at 843. The Court believes this to be the appropriate standard for the imposition of punitive damages for a violation of the discharge injunction.

 The Court finds that Wells Fargo's actions were both intentional and egregious. Wells Fargo charged improper fees during the life of the Chapter 13 case. Wells Fargo attempted to collect those improper fees after Plaintiffs received their discharge by making numerous telephone calls and sending numerous ominous letters to Plaintiffs demanding that Plaintiffs become current or face foreclosure. Wells Fargo ignored two letters sent by Plaintiffs' counsel attempting to resolve the matter. Wells Fargo made false entries on Plaintiffs' credit reports. Wells Fargo overcharged Plaintiffs when Plaintiffs' house was sold. Finally, Wells Fargo completely ignored the complaint in this adversary proceeding, opting not to file an answer or to become otherwise involved until after the entry of a default. The Court finds that Wells Fargo's conduct warrants an award of punitive damages in the amount of $15,000.00. The Court will deny Plaintiffs' request for an additional $100.00 per day penalty from April 11, 2006 until payment in full of all sanctions.

### Attorney's Fees

 Plaintiffs seek attorney's fees of $21,177.50. Plaintiffs' attorney asserts that he and his firm spent a total of 133.6 hours on this matter, 87 of which represents attorney time with hourly rates ranging from $100.00 to $250.00 and 46.6 of which represents paralegal time with hourly rates ranging from $75.00 to $80.00. Under federal law attorney's fees are awarded based upon the lodestar method of computation. *See Johnson v. Georgia*

*Highway Express, Inc.*, 488 F.2d 714, 717–718 (5th Cir.1974). In determining whether an attorney's fee is reasonable, a court must determine the lodestar, the product of the number of hours reasonably expended and a reasonable hourly rate. *See John Deere Co. v. Deresinski (In re Deresinski)*, 250 B.R. 764, 768 (Bankr.M.D.Fla.2000) (citations omitted). In order to apply the lodestar method an attorney must provide the Court with contemporaneous time records detailing the dates, amount, and specific services provided. *See In re Newman*, 2003 WL 751327 *3 (Bankr.M.D.Fla. February 18, 2003) (citing *In re First Colonial Corp. of America*, 544 F.2d 1291, 1300 (5th Cir.1977)). A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895–896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with the prevailing market rate. *NAACP v. City of Evergreen*, 812 F.2d 1332, 1338 (11th Cir.1987). Upon a review of Plaintiffs' counsel's contemporaneous time records detailing the dates, amount, and specific services provided, the Court finds the fees sought for both attorney and paralegal time to be reasonable and will award the total amount sought.

### Costs

 Plaintiffs seek costs of $842.00 comprised of Ms. DeRidder's witness fee of $350.00 and Plaintiffs' costs of $492.00 to attend the hearing. The Court finds these costs to be reasonable.

### Conclusion

Wells Fargo's actions in attempting to collect a discharged debt violated the discharge injunction. Plaintiffs are entitled

to the following damages: 1) $3,383.44 for overcharges at closing; 2) $15,000.00 for punitive damages; 3) $21,177.50 for attorney's fees; 4) costs of $842.00; and 5) correction of their credit reports to reflect no late payments. The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.